IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SCANROCK OIL & GAS, INC., *et al.*, | § | Case No. 25-90001-mxm11 |
| | § | |
| Debtors.[1] | § | Joint Administration Requested |
| | § | |

### DECLARATION OF BRAD WALKER IN SUPPORT OF
### DEBTORS' CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, I, Brad Walker, hereby declare under penalty of perjury:

### Introduction

1.       My name is Brad Walker.  I am a Managing Director at Riverbend Special

Situations Group ("Riverbend") where I specialize in advising distressed companies and other

parties in restructurings and chapter 11 situations.  I am based in Dallas, Texas with approximately

37 years of experience in investment banking, principal investing, consulting, and restructuring

advisory services.  I have been involved in dozens of chapter 11 cases involving reorganization,

asset dispositions, orderly liquidation, and other turnaround strategies.  Over the course of my

career, I have advised senior management in a wide variety of industries, including the oil and gas

exploration and production industry, in connection with restructurings, asset dispositions, wind-

downs, and financing transactions.  Riverbend and its senior professionals have extensive

experience in the reorganization and restructuring of distressed companies, both out-of-court and

in chapter 11 proceedings.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, if any, are: Scanrock Oil & Gas, Inc. (0380); O'Ryan Family Limited Partnership (1913); O'Ryan
Production & Exploration Ltd. (9950); O'Ryan Ranches, Ltd. (7184); Ryan C. Hoerauf, Inc. (0493); Smackover
Oil Treaters, Ltd. (9529); O'Ryan Ponderosa, LLC (1476); EON Production, LLC (0136). The location of the
Debtors' service address is 8180 Lakeview Center, Ste. 300, Odessa, TX 79765.

2.      On January 29, 2025, I was retained as a restructuring advisor and appointed as the Chief Restructuring Officer ("CRO") for Scanrock Oil & Gas, Inc. ("Scanrock"); O'Ryan Production & Exploration Ltd.; O'Ryan Family Limited Partnership; Ryan C. Hoerauf, Inc. ("O'Ryan Oil and Gas"); Smackover Oil Treaters, Ltd.; O'Ryan Ponderosa, LLC; EON Production, LLC (collectively, the "Oil & Gas Debtors"); and O'Ryan Ranches, Ltd. ("O'Ryan Ranches", and with the Oil & Gas Debtors, the "Debtors" or the "Company").[2]  In this capacity, I am familiar with the Debtors' businesses, financial affairs, and day-to-day operations.

3.      On December 9, 2024, Jobe Law PLLC ("Jobe Law") was retained by O'Ryan Oil and Gas on a consulting basis to advise on bankruptcy options for the borrowers on the Prepetition Loan (defined below) with Prosperity Bank.  On January 30, 2025, the Oil & Gas Debtors retained Munsch Hardt Kopf & Harr, P.C. ("Munsch Hardt") as counsel to handle the potential and ultimate filing of these chapter 11 cases (the "Chapter 11 Cases").  On the same day, O'Ryan Ranches retained Jobe Law to represent it in these Chapter 11 Cases and Jobe Law concluded its representation of any Oil & Gas Debtors.  The Debtors have also recently retained Lain, Faulkner & Co., P.C. ("Lain Faulkner") in order to assist with accounting and reviewing the Company's books and records as part of preparing schedules, statements of financial affairs, and monthly operating reports during these Chapter 11 Cases.

4.      On February 3, 2025, Scanrock and O'Ryan Ranches filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Court").  On February 9, 2025 (the "Petition Date"), the remaining Debtors filed for chapter 11 in this Court

---

[2]  As of this date, I have not been retained by, or appointed as CRO of, O'Ryan Ranches at this time.

for all of the Debtors to be jointly administered.[3]  Through these Chapter 11 Cases, the Debtors

intend to maximize the value of their estates through a marketing and sale process for certain real

property assets, the completion of certain oil and gas well workovers, and the confirmation of a

chapter 11 plan of reorganization.

5.      I submit this declaration (the "First Day Declaration"), pursuant to Rule 1007 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) to provide an overview

of the Debtors' business operations, assets, and these Chapter 11 Cases, and (b) to support the

Debtors' emergency applications and motions for "first day" relief (collectively, the "First Day

Motions").

6.      This Declaration has been organized into four main sections as follows:

- Part I describes the Debtors' historical background, business operations, and assets;

- Part II describes the Debtors' prepetition corporate and capital structure;

- Part III describes the circumstances and events leading to the filing of these Chapter 11 Cases and the Debtors' restructuring efforts; and

- Part IV provides the evidentiary basis for the relief requested in the First Day Motions.

## I.      THE COMPANY'S HISTORY AND BUSINESS OPERATIONS

### A.      History

7.      Ryan C. Hoerauf, principal of the Debtors, grew up in North Dakota in a family of

entrepreneurs. After graduating from the University of North Dakota with a bachelor's degree in

Chemical Engineering in 1981, Mr. Hoerauf moved to West Texas for a job with Getty Oil and to

attend the University of Texas of the Permian Basis where he received a Master of Business

Administration degree.  During his time at Getty Oil (which was acquired by Texaco in 1984), Mr.

---

[3]  For the avoidance of doubt, the "Petition Date" for Scanrock and O'Ryan is February 3, 2025.

Hoerauf studied and learned the full spectrum of the oil and gas business, from mineral acquisition and drilling to casing and completion to transport and processing. By 1990, Mr. Hoerauf left Texaco in order to start his own oil and gas company in Midland County.

8.      For the next 35 years, Mr. Hoerauf acquired many properties, leases, wells, and working interests across the States of Texas, Louisiana, and New Mexico and expanded his own oil and gas operations. In time, Mr. Hoerauf developed a specialization in exploration and production of otherwise traditionally uneconomical fields by using vertically integrated treatment facilities in order to convert certain hydrocarbon production into a higher grade of oil which can be more easily refined into gasoline, diesel, and jet fuel. For example, Mr. Hoerauf found great success converting oil production with properties similar to "West Texas Sour Crude" into "Louisiana Sweet Crude" (*i.e.*, a type of light crude oil with lower sulfur content in high demand). Further, Mr. Hoerauf found success venturing into the sand, gravel, and crushed limestone business for well fracking as well as the mineral processing industry for oil, gas, and other hydrocarbons.

9.      As an entrepreneur, Mr. Hoerauf worked extremely hard and achieved tremendous success building his businesses and drilling his wells with a hands-on approach in the field. Since first arriving in Texas in 1977, Mr. Hoerauf never lost that entrepreneurial spirit or the commitment toward building his businesses in Texas. To this day, Mr. Hoerauf continues to manage operations across his companies for all exploration, drilling, and production.

**B.      The Debtors' Oil & Gas Operations and Assets**

10.      At this time, the Debtors' primary oil and gas operations and interests are located in (i) the Smackover Formation in Kaufman, Navarro, and Henderson Counties, Texas and (ii) the Todd Deep Field in Crockett County, Texas. According to the reserve report prepared by Russell K. Hall and Associates, Inc. dated November 3, 2022, the Debtors' proved developed producing

(PDP) reserves had a discounted net income of approximately $24.6 million as of October 1, 2022. The Debtors also maintain interest in gathering systems, rights of way, and oil and gas processing facilities located in Navarro and Henderson Counties, Texas.

11.     As of the Petition Date, the Debtors were in the process of completing at least two well workovers (the "Workover Wells") and related drilling operations in the Smackover Formation located about 70 miles southeast of Fort Worth.  These horizontal wells span underneath Cedar Creek Lake with a deep oil reservoir for production.  The Debtors anticipate significant stimulation and production from each of the Workover Wells upon completion of the drilling and workover process with the potential for significantly more expansion in the same reservoir and formation.  The completion of the drilling and workover process on the Workover Wells is critical for increasing cash flow in these Chapter 11 Cases.

12.     The Debtors' employ 18 full-time employees and 12 independent contractors. These employees and contractors are necessary to properly preserve, maintain, and expand the operations, assets, and investments of the Debtors for the benefit of their estates.

### C.     The Real Property Assets

#### i.     *Oregon Ranch*

13.     Two non-debtor wholly-owned affiliates, O'Ryan Ranches LLC and O'Ryan Oregon Ranches LLC, own 44,328.88 contiguous acres of real property located approximately 11 miles east of Prineville in Crook County, Oregon (the "Oregon Ranch").[4]  The Oregon Ranch is also known as the "Ochoco Ranch" and is a timbered high country property with exceptional location and wildlife as well as timber and lumber operations.  The Oregon Ranch has numerous improvements and structures, including the main house, hunting lodge, cabins, barns, storage

---

[4] Debtor O'Ryan Family Limited Partnership owns 100% of the interests of the non-debtor entities which own the Oregon Ranch.

structures, water, and electricity, solar, wind, and propane energy.  Notably, the Oregon Ranch also provides significant carbon tax credits from its timberland forests which have substantial value on the market.  In March of 2023, the Oregon Ranch was appraised at a value of $60,950,000.  The Oregon Ranch is currently listed for sale for $60 million.

 

### ii.     Llano Ranch

14.     Debtor O'Ryan Ranches, Ltd. owns 1,739.514 contiguous acres of real property located in the southwest portion of Llano County, Texas (the "Llano Ranch").  The Llano Ranch is a working property marked by rolling hills overlooking the Llano River Valley.  The Llano Ranch has numerous structures, improvements, wells, electricity, interior roads, and fencing.  As of the Petition Date, the Llano Ranch would likely be valued at up to $25 million on the market in an extremely popular region of the Texas Hill Country.

## II.     THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE

### A.     The Debtors' Corporate Structure and Ownership

15.     The following organizational chart details the ownership of each of the Debtors. The non-debtor ownership entities/individuals are identified in blue, the Debtors are identified in green, and the non-debtor affiliates which hold the Oregon Ranch are identified in white.



### B.    The Debtors' Debt Obligations

#### i.    *Prepetition Secured Indebtedness*

16.    Prosperity Bank ("Prosperity"), as successor by merger to Lone Star State Bank of West Texas as administrative agent and lender, is party to that certain *Restated Loan Agreement*, dated as of April 1, 2023 (the "Prepetition Loan Agreement"), with the Debtors and certain non-debtor affiliates (collectively, the "Borrowers").[5]  Each of the Borrowers executed and delivered promissory notes dated April 1, 2023 in the aggregate original principal amount of $48,973,536.40 (the "Notes" and together with the Prepetition Loan Agreement, pledge agreements, letters of credit, and related loan documents, the "Prepetition Loan Documents") evidencing their obligations to Prosperity in connection with a loan or loans in such original principal amount (the "Prepetition Loan").  The Ryan C. Hoerauf 2008 Delaware Trust is the guarantor of the Prepetition Loan.

17.    The Prepetition Loan was secured by, among other things, certain capital stock, securities, membership interests, and partnership interests; deeds of trust pledging the Oregon

---

[5]  The Loan Agreement is a restatement of a previously existing revolving line of credit.

Ranch[6], the Llano Ranch, and certain real property located in Burnet County, Texas; and all oil and gas leasehold, royalty, and mineral interests, along with accompanying equipment located thereon and proceeds derived therefrom in the State of Texas.

18.      As of the Petition Date, the aggregate amount of outstanding prepetition loan obligations owed to Prosperity pursuant to the Prepetition Loan Documents is not less than $50,038,560.52 as of February 3, 2025, and not less than $50,142,060.73 as of February 9, 2025.

### ii.      *Prepetition Unsecured Indebtedness*

19.      Through its oil and gas operations, the Debtors incur certain necessary expenses to vendors, contractors, suppliers, and oilfield service providers in the ordinary course of business. As of the Petition Date, the Debtors estimate that they have incurred approximately $10.5 million in general unsecured debt.  However, the Debtors and Lain Faulkner continue to review the Company's books and records in order to determine the precise amount of unsecured claims.

### iii.      *Prepetition Royalty Interests*

20.      As of the Petition Date, the Debtors pay approximately $120,000 per month to royalty and working interest owners based on the revenue received from oil and gas operations, which is typically paid to interest owners on the 25th day of the succeeding month.  The Debtors will seek to allow or segregate the payment of January royalty payments in the ordinary course of business in order to avoid disruptions in revenue payments received by the Debtors from their midstream operator, Plains Marketing LP.  The Debtors and Lain Faulkner continue to review the Company's books and records in order to reconcile certain unpaid royalties in prior months.  As of the Petition Date, the Debtors estimate that they may owe in excess of $6 million in unpaid

---

[6]  AgWest Farm Credit, FLCA ("AgWest") has a senior first lien on the Oregon Ranch and outstanding debt of approximately $10.8 million pursuant to a loan agreement with certain non-debtor entities.  Prosperity has a second lien on the Oregon Ranch and is subordinated to AgWest with regard to the Oregon Ranch.

prepetition royalty interests, which includes in excess of $3 million attributable to accounts identified as in suspense.

### III.   EVENTS LEADING TO BANKRUPTCY AND THE FILING OF THESE CHAPTER 11 CASES

21.    Over the many years of operation, the Debtors have bought and sold numerous oil and gas assets through volatile commodity markets and challenging periods in the oil and gas industry.  Beginning in late 2014, a severe decline in crude oil prices and continued decline in natural gas prices led to a significant overall contraction in crude oil and natural gas drilling activities and capital spending by exploration and production companies.  After some recovery in 2016 of a portion of the losses in crude oil prices since 2014, crude oil prices began another declining trend in late 2018.  During which time, the Debtors faced challenges in producing the same type of historical revenues as well as in selling certain oil and gas assets in east and west Texas at prices close to their previous market value.

22.    As interest rates sharply rose from approximately 4% to 8.75% in 2021, the Debtors began to face increased liquidity strain and struggled to satisfy more than the minimum interest payments to Lone Star State Bank of West Texas (predecessor to Prosperity).  In 2023, the Debtors commenced negotiations with Lone Star State Bank of West Texas to refinance the Prepetition Loan; however, those efforts stalled.  In August of 2024, after Prosperity acquired Lone Star State Bank of West Texas, the Debtors met with Prosperity in order to consider certain workout strategies, including the sale of certain assets, in an effort to fund payments of principal on the Prepetition Loan.

23.    On October 8, 2024, after the Prepetition Loan matured on September 3, 2024, Prosperity sent a demand letter to the Debtors for payment in full of all unpaid obligations under the Prepetition Loan Documents, including, without limitation, the unpaid principal amount of the

Prepetition Loan, all accrued and unpaid interest thereon, and all accrued and unpaid fees.   On

October 11, 2024, the Debtors proposed a plan to bring its Prepetition Loan into compliance, which

included the sale of the Oregon Ranch pursuant to a letter of intent dated September 17, 2024 in

an amount sufficient to satisfy the outstanding obligations owed to Prosperity under the Prepetition

Loan Documents.

24.     On or about December 2, 2024, the Debtors and Prosperity entered into that certain

*Forbearance Agreement* dated as of December 2, 2025 (the "<u>Forbearance Agreement</u>").  Pursuant

to the Forbearance Agreement, Prosperity agreed to forbear from the exercise of any of its rights

and remedies under the Prepetition Loan Documents in connection with certain defaults until

March 31, 2025 (the "<u>Forbearance Period</u>").  The Debtors agreed to deliver to Prosperity a fully-

executed purchase and sale agreement for the Oregon Ranch in an amount not less than $50 million

by December 15, 2024.

25.     During which time, the Debtors and their broker continued to aggressively market

the Oregon Ranch for sale to the highest bidder.  Through such efforts, the Debtors sought to close

the sale of the Oregon Ranch with a potential purchaser who was willing to execute a purchase

and sale agreement for an amount necessary to pay Prosperity in full.  However, the potential

purchaser fell ill and was unable to execute a purchase and sale agreement by December 15, 2024.[7]

26.     On December 17, 2024, Prosperity sent the Debtors a notice of default under the

Forbearance Agreement as a result of the Debtors' failure to deliver to Prosperity a fully-executed

purchase and sale agreement for the Oregon Ranch pursuant to the terms of the Forbearance

Agreement.  Prosperity terminated the Forbearance Period and demanded immediate payment in

full of all outstanding obligations under the Loan Documents.

---

[7] Notably, at this time, the potential purchaser has continued to show strong interest in signing a purchase and sale agreement in the coming weeks, along with several other third parties.

27.     On January 8, 2025, Prosperity sent notice to the Debtors regarding Prosperity's intent to foreclose on the Llano Ranch at a duly-noticed state foreclosure sale on February 4, 2025. On January 29, 2025, Prosperity sent the Debtors a notice of disposition of certain common shares of stock in PB Materials Holdings, Inc. held by the Debtors and scheduled the disposition for February 10, 2025.  On January 31, 2025, a state-court appointed receiver sent letter to Prosperity seeking to freeze the bank accounts of Debtor Ryan C. Hoerauf, Inc. based on a turnover order issued by the 152nd District Court of Harris County, Texas.  As a result of these precipitating events, on or around January 30, 2025, the Debtors hired Jobe Law, Munsch Hardt, Riverbend, and Lain Faulkner to prepare and file these Chapter 11 Cases on an emergency basis.

28.     Following extensive arm's length negotiations regarding the use of cash collateral, Prosperity has consented to the use of cash collateral on an interim basis pursuant to the terms of the interim cash collateral order (subject to the Court's approval).  With the continued use of cash collateral, the proposed sale of the Oregon Ranch, and the increased cash flow from the Workover Wells, I believe that the Debtors can successfully reorganize their operations and potentially pay all of their creditors in full through a plan of reorganization.

## IV.     EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS

29.     Prior to the filing of this First Day Declaration, the Debtors filed a number of First Day Motions[8] seeking relief to minimize the adverse effects of the commencement of these Chapter 11 Cases on their business and to ensure that their reorganization strategy can be implemented with limited disruptions to operations.  Approval of the relief requested in the First Day Motions is critical to the Debtors' ability to continue operating their business with minimal disruption and thereby preserve value for the Debtors' estates and various stakeholders. I have

---

[8]  Capitalized terms used but not otherwise defined in this section of the First Day Declaration shall have the meanings ascribed to them in the relevant First Day Motion.

11

reviewed each of the First Day Motions and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.

### A.      Joint Administration Motion [Docket No. 10]

30.      Through the *Debtors' Emergency Motion for Joint Administration* (the "Joint Administration Motion"), the Debtors request authorization to jointly administer these Chapter 11 Cases for procedural purposes only.

31.      Scanrock Oil & Gas, Inc.; O'Ryan Family Limited Partnership; O'Ryan Production & Exploration, Ltd.; Ryan C. Hoerauf, Inc.; Smackover Oil Treaters Ltd.; O'Ryan Ponderosa, LLC; EON Production, LLC; and O'Ryan Ranches, Ltd. are affiliated entities under common management and share substantially identical owners.  Joint administration of these cases will remove the need to prepare, replicate, file, and serve duplicative notices, orders, pleadings, papers, and documents, saving the Debtors and their estates substantial time and expense. Further, joint administration will relieve the Court of entering duplicative orders and maintaining duplicative files and dockets.  The United States Trustee for the Northern District of Texas (the "U.S. Trustee") and other parties in interest will similarly benefit from joint administration of these Chapter 11 Cases by sparing them the time and effort of reviewing duplicative notices, orders, pleadings, papers, and other documents.

32.      It is my opinion that joint administration will not adversely affect creditors' rights because the Joint Administration Motion requests only the administrative consolidation of the estates. The Joint Administration Motion does not seek substantive consolidation. Each creditor may still file its claim against a particular estate.

33.     I believe that the relief requested in the Joint Administration Motion is in the best

interest of the Debtors' estates, creditors, and all other parties in interest. Accordingly, on behalf

of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.**      **Schedules Motion [Docket No. 12]**

34.     Through the *Debtors' Emergency Motion for Entry of an Order Extending the Time

to File Schedules and Statements* (the "Schedules Motion"), the Debtors request entry of an order

extending the deadline by which the Debtors must file their schedules of assets and liabilities,

schedules of current income and expenditures, schedules of executory contracts and unexpired

leases, and statements of financial affairs (collectively, the "Schedules and Statements") by 30

days, for a total of 44 days from the Petition Date.

35.     There are 8 Debtors in these Chapter 11 Cases. To prepare the Schedules and

Statements, the Debtors must compile information from books, records, and documents maintained

by each of these 8 entities, relating to the claims of a multitude of creditors, as well as the Debtors'

many assets and leases. Given the scope of the Debtors' operations, it will take substantial time to

gather and process such information. The Debtors have a limited number of employees with

detailed knowledge of the Debtors' financial affairs and the skill to perform the necessary review

and analysis of the Debtors' financial records. In light of the size and complexity of the Debtors'

businesses, and the resulting significant amount of work required to complete the Schedules and

Statements, as well as the competing demands on the Debtors' employees and professionals to

assist in critical efforts to stabilize the Debtors' business operations during the initial postpetition

period, an extension is necessary.

36.     The requested extension also will aid the Debtors in efficiently preparing accurate

Schedules and Statements, as it will allow the Debtors to account for prepetition invoices not yet

received or entered into their accounting systems as of the Petition Date, and will minimize the possibility that any subsequent amendments to the Schedules and Statements are necessary. As such, the extension will benefit not only the Debtors, but all creditors and other parties in interest.

37. Although the Debtors, with the assistance of their professional advisors, have begun to compile the information necessary for the Schedules and Statements, the Debtors have been consumed with a multitude of other legal, business, and administrative matters in the weeks prior to the Petition Date. Nevertheless, recognizing the importance of the Schedules and Statements in these Chapter 11 Cases, the Debtors intend to complete the Schedules and Statements as quickly as possible under the circumstances. The Debtors expect that they will require at least 30 additional days to finalize the Schedules and Statements.

38. I believe that the relief requested in the Schedules Motion is in the best interests of the Debtors' estates, creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules Motion should be approved.

        **C.**      **Consolidated Top 30 Motion [Docket No. 13]**

39. In the *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Top 30 Unsecured Creditors and Consolidated List of Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information of Individual Creditors and Current and Former Employees, and (III) Granting Related Relief* ("Consolidated Top 30 Motion"), the Debtors request entry of an order (i) authorizing the Debtors to file a consolidated list of the top 30 unsecured creditors and a consolidated list of creditors, (ii) authorizing the Debtors to redact certain personal identification information of individual creditors and current and former employees of the Debtors, and (iii) granting related relief.

40.     Because the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome, the Debtors respectfully request authority to file one Consolidated Creditor Matrix for all Debtors.  The relief requested in the Consolidated Top 30 Motion will promote administrative efficiency and preserve value of the Debtors' estates for the benefit of all parties in interest. Moreover, the request for limited service will ensure that the Debtors' limited estate resources are not wasted on overly-burdensome notices which, if provided to all creditors on the creditor matrix, may cost more than a thousand dollars per filing.

41.     Accordingly, I believe that the relief requested in the Consolidated Top 30 Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and, for the reasons set forth herein and in the Consolidated Top 30 Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Consolidated Top 30 Motion should be granted.

### D.     Wages Motion [Docket No. 14]

42.     Through the Debtors' *Emergency Motion for Authority to Pay Prepetition Wages and Related Payroll Expenses* (the "Wages Motion"), the Debtors seek authority under Bankruptcy Code sections 105(a), 363, 507(a)(4) and 507(a)(5) and Bankruptcy Rule 6003 to pay certain prepetition Payroll Obligations owed to current employees and to continue processing Payroll Obligations in the ordinary course of business as payments critical to the preservation of the Debtors' going concern value and effective reorganization.

43.     In the ordinary course of business, the Debtors incur payroll obligations for wages owed to their Employees and Contractors on a bi-weekly, semi-monthly, and monthly basis. In order to maintain goodwill with the Employees and Contractors that provide vital contributions to

the Debtors' operations, the Debtors request authority to satisfy such Employees' and Contractors'

pre-petition and accruing Payroll Obligations in the ordinary course of business.

44.     As of the Petition Date, the Debtors employ approximately 18 individuals

("Employees") and an average of 12 independent contractors ("Contractors") (together, the

"Employees and Contractors") who perform a variety of functions and services critical to all of the

Debtors' operations, and who will be necessary to the administration of these Bankruptcy Cases

and the Debtors' prospects for a successful reorganization. Certain of these individuals are highly

trained and/or have an essential working knowledge of the Debtors' business and cannot be easily

or quickly replaced.  The Debtors depend on the Employees and Contractors' skills, knowledge,

and understanding of the Debtors' operations and, without the continued, uninterrupted services

of the Employees and Contractors, an effective reorganization of the Debtors will not be possible.

45.     The Debtors' Employees and Contractors rely on the compensation and health and

welfare benefits provided by the Debtors to pay their daily living expenses and to support their

families. The wages and benefits that the Debtors provide impose certain obligations upon the

Debtors related to: (i) Wage Obligations, (ii) Withholding Obligations, and (iii) Benefit

Obligations (each as defined below, and collectively, the "Payroll Obligations").  The Employees

and Contractors will suffer financial hardships if the Debtors are not permitted to continue paying

wages and providing employee benefits in the ordinary course of business. In order to minimize

any disruption of the Debtors' businesses, the Debtors request the authority to continue to satisfy

the Employee Obligations in the ordinary course of business and in a manner consistent with the

Debtors' prepetition policies.

46.     In the ordinary course of business, the Debtors incur payroll obligations for wages,

salaries, and other compensation earned by its Employees and Contractors (collectively,

the "Wage Obligations"). In connection with the same, certain federal and state laws require the

Debtors to withhold amounts from the Employees' earned pay related to FIT taxes, FICA taxes,

Medicare taxes, and/or child support and other withholdings (the "Withholding Obligations").

Further, the Debtors provide certain employee benefits including health insurance, prescription

drug coverage, and worker's compensation as well as reimbursement for certain approved

expenses and two auto allowances (the "Benefit Obligations"). The Debtors pay the Employees'

Wage Obligations on a bi-weekly basis (every second Friday) for 9 hourly Employees and on a

semi-monthly basis (the 15th and the end of the month) for 9 salaried Employees, as summarized

by the table below. The Debtors pay their Independent Contractors for the services rendered by

the Contractors in accordance with the terms of their applicable agreements. The Contractors'

Wage Obligations are paid on a semi-monthly basis (the 15th and the end of the month) for 3

Contractors and monthly basis for 9 Contractors (end of the month), as summarized in the table

below. Further summarized in the table below are the average Withholding Obligations and

Benefit Obligations for each payroll cycle.

| Pay Frequency | Employees or Contractors | Approx. Number | Wage Obligations (Net) | Withholding Obligations | Benefit Obligations[9] |
|---|---|---|---|---|---|
| Bi-Weekly | Employees | 9 | $19,500 | $3,800 | $6,392 |
| Semi-Monthly | Employees | 9 | $20,500 | $4,600 | $5,978 |
| Semi-Monthly | Contractors | 3 | $3,400 | N/A | N/A |
| Monthly | Contractors | 9 | $73,000 | N/A | $6,600 |
| | | Totals | $116,400 | $8,400 | $18,970 |
| | | | | | $143,770 |

47.     The Debtors process payroll internally with Wage Obligations remitted by checks.

Payroll has been processed pre-petition for January; however, certain of the Debtors' Employees

---

[9]     All Benefit Obligations accrue and are paid on a monthly basis.

and Contractors may have failed to process their checks prior to the Petition Date. The Debtors

estimate that the accrued and unpaid prepetition Payroll Obligations owed to Employees and

Contractors does not exceed the total of $143,770 as set forth in the table above (the "Prepetition

Payroll Obligations"). The Debtors request authority, but not direction, to process and pay all

accrued and unpaid Prepetition Payroll Obligations to their Employees and Contractors up to the

total of $143,770 and to continue to process and pay the Payroll Obligations after the Petition Date

in the ordinary course of business and consistent with historical practices; *provided*, *however*, that

no individual Employee or Contractor will be paid in excess of the $15,150 priority cap set forth

in section 507(a)(4) of the Bankruptcy Code.

48.     I believe that the relief requested in the Wages Motion is in the best interests of the

Debtors' estates, creditors, and all other parties in interest. Accordingly, on behalf of the Debtors,

I respectfully submit that the Wages Motion should be approved.

**E.     Utilities Motion [Docket No. 18]**

49.     Through the Debtors' *Emergency Motion for an Order (I) Approving the Debtors'*

*Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility*

*Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors'*

*Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related*

*Relief* (the "Utilities Motion"), the Debtors seek entry of an order: (i) prohibiting the Utility

Companies from altering or discontinuing service on account of unpaid prepetition invoices, (ii)

establishing the Procedures set forth in the Utilities Motion for resolving any disputes regarding

requests for adequate assurance of payment.

50.     In the normal conduct of their business operations, the Debtors have relationships

with many different utility companies and other providers (each a "Utility Company" and,

collectively, the "Utility Companies") for the provision of electric, water, sewer, natural gas, recycling and waste removal, telecom and internet services, and similar utility products and services (collectively, the "Utility Services"). The Debtors' Utility Companies include the entities set forth below:

| Provider | Service | Average Monthly Expenditure |
|---|---|---|
| **Big Country Electric Coop.**<br>PO Box 518<br>Roby, TX 79543 | Electric | $10,911 |
| **Central Texas Electric Coop.**<br>PO Box 473<br>Fredericksburg, TX 78624 | Electric | $270 |
| **Chatfield Water Supply Co.**<br>PO Box 158<br>Powell, TX 75153 | Water | $1,352 |
| **Greenbelt Electric Coop.**<br>PO Box 948<br>Wellington, TX 79095 | Electric | $2,466 |
| **Navarro County Electric Coop. Inc.**<br>PO Box 616<br>Corsicana, TX 75151 | Electric | $1,006 |
| **NRG Electric**<br>PO Box 1532<br>Houston, TX 77251 | Electric | $25,462 |
| **Pedernales Electric Coop. Inc.**<br>PO Box 1<br>Johnson City, TX 78636 | Electric | $53 |
| **Republic Services**<br>PO Box 677156<br>Dallas, TX 75267 | Waste | $3,633 |
| **Southwest Texas Electric Coop. Inc.**<br>PO Box 70878<br>Charlotte, NC 28272 | Electric | $49,071 |
| **Trinity Valley Electric Coop. Inc.**<br>PO Box 1228<br>Kaufman, TX 75142 | Electric | $827 |
| **Taylor Electric Coop.**<br>PO Box 250<br>Merkel, TX 79536 | Electric | $5,860 |
| **Xcel Energy**<br>PO Box 660553<br>Dallas, TX 75266 | Electric | $20 |

| **Central Electric**<br>PO Box 846<br>Redmond, OR 97756 | Electric | $300 |
|---|---|---|
| **West Cedar Creek Municipal Utility**<br>821 S Tool Drive<br>Tool, TX 75143 | Water | $247 |
| | | $101,478 |

51.     The historical average monthly amount owed to the Utility Companies in the aggregate is approximately $101,478.00. The Debtors owe certain amounts to Utility Companies as of the Petition Date for prepetition Utility Services. Due to the timing of the Petition Date in relation to the Utility Companies' billing cycles, certain Utility Services have been invoiced but not yet paid, and other Utility Services have been provided but not yet invoiced.

52.     I anticipate that the cash flow from their ongoing business operations will be sufficient to allow the Debtors to satisfy all administrative expenses, and the Debtors intend to pay all post-petition obligations owed to the Utility Companies in a timely manner. Nevertheless, to provide additional adequate assurance of payment for future Utility Services, the Debtors will deposit $50,739.00, or approximately 50% of the Debtors' historical monthly cost of their Utility Services based on a three-month average (the "Adequate Assurance Deposit"), into their operating account at Prosperity Bank, subject to the terms and conditions of any applicable orders authorizing the Debtors to enter into the same. The Debtors will maintain a minimum balance equal to at least fifty percent (50%) of the Debtors' historical monthly cost of Utility Services from the Utility Companies, which may be adjusted by the Debtors to account for the termination of Utility Services by the Debtors or other arrangements with respect to adequate assurance of payment reached with individual Utility Companies.

20

53.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

**F.      Critical Vendor Motion [Docket No. 15]**

54.     Through the Debtor's *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors, and (II) Granting Related Relief* (the "Critical Vendor Motion"), the Debtors seek authority, but not direction, to pay the Critical Vendor Claims of certain Critical Vendors necessary for the continued operation of the Debtors' businesses and preservation of the value of their estates, and granting related relief.

55.     The Debtors' business operations depend on certain vendors who provide critical services. The Debtor has compiled a list of Critical Vendors and pre-petition amounts owed to same, totaling approximately $175,000.00. I have spent extensive time reviewing accounts payable and determining which vendors are truly critical so as to qualify as a Critical Vendor under the Critical Vendor Motion. I have also worked extensively with the Debtors' management, as well as the Debtors' other professionals, to discuss each such Critical Vendor and to make the determination that the same should be included in the proposed Critical Vendor budget of $175,000.00.

56.     The following table summarizes the types of claims that the Debtors request authority to pay under this Motion as well as estimated aggregate prepetition amounts outstanding as to each type:

| Name | Description | Relief Requested |
|---|---|---|
| Pureflow Technologies, Inc. | Full service chemical company that provides tank, pump, and containment installation, inventory monitoring, pump repair and delivery services. Pureflow | $66,336.00 |

| | | |
|---|---|---|
| | additionally provides on-site technical services and lab analysis such as full water analysis, oil and grease reports, millipore filter analysis, hydrogen disulfide and carbon dioxide monitoring, iron counts, and emulsion testing. | |
| Compression Controls & Rentals | Compression equipment and related rental services necessary for field and plant operations and maintain pressurizations essential thereto. | $21,347.00 |
| Whitley Penn | Full service public accounting firm with historical knowledge of the Debtors' (including non-debtor affiliates') operations that is currently engaged in preparing tax returns due February 2025. | $87,000.00 |

57.     Pureflow Technologies, Inc.'s services are crucial to the Debtors' operations because it is a sole source provider of the chemical treatment and related services necessary to treat and then market the Debtors' produced oil.  Without Pureflow's services, the Debtors would largely be unable to generate revenue oil production; and without paying Pureflow's prepetition claims, it may cease to provide such vital and indispensable services to the Debtors.  Similarly, Compression Controls & Rentals' services are crucial to the Debtors' operations because it cannot maintain the pressurization required to produce, transport, and treat the generated oil without the rented compressors and related equipment.  If Compression Controls & Rentals' prepetition balance remains unpaid, it may cease providing the goods and services required by the Debtors' to maintain their business operations.  Finally, Whitley Penn's services are crucial to the Debtors because they are already engaged in the preparation of the Debtors' and affiliated non-debtors' federal tax returns that are due February, 2025.  Whitley Penn is familiar with the historical operations of the Debtors and their affiliates and, while another accounting firm could theoretically provide such services, it would require massive duplication of effort and loss of the historical knowledge Whitley Penn has amassed through its prior work with the Debtors and their affiliates.

If Whitley Penn is not paid the prepetition balance owing, it may cease providing such services to the detriment of the Debtors and their estates.

58.      Any disruption in connection with the Critical Vendors will prevent efficient operation of the Debtors' businesses. Even a temporary disruption of the Debtors' operations at this critical juncture would lead to adverse consequences and significantly threaten the Debtors' prospects for effective reorganization. Furthermore, due to the specialized nature of the Debtors' operations, the Critical Vendors are generally the sole providers of goods and/or services of that nature required by the Debtor.  Even if the Critical Vendors are not sole-source suppliers because others in the market are theoretically capable of replacing them, they are for all intents and purposes sole-source suppliers because the Debtor cannot replace them quickly and not without incurring new expenses that likely would exceed the amounts owed to each of the Critical Vendors by comparison. Accordingly, it is imperative that the Debtors maintain a positive relationship with the Critical Vendors throughout the course of the Bankruptcy Case and therefore crucial that the Debtor be authorized to pay the Critical Vendors in the ordinary course so as to avoid the potential disruption to their operations.

59.      I believe that the relief requested in the Critical Vendor Motion is in the best interest of the Debtors' estates, creditors, and all other parties in interest. The Debtors seek authority, but not direction, to pay the Critical Vendors up to a total aggregate amount of $175,000.00 on account of the outstanding pre-petition Critical Vendor Claims.

### G.      Royalty Motion [Docket No. 16]

60.      Through the Debtors' *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Make or Honor Royalty Payments and Working Interest Disbursements and (II) Granting Related Relief*  (the "Royalty Motion"), the Debtors seek authority to pay certain

prepetition amounts on account of outstanding royalty, working, and other interests (collectively, the "Interest Owner Payments") as they come due and payable in the ordinary course of business, and related relief.

61.     In the ordinary course of business, the Debtors incur obligations related to the Interest Owner Payments that average approximately $120,000 per month in relation to approximately 90 interest holders. The Interest Owner Payments are typically processed on or around the 25th day of each month after reconciliation of revenues from the sale of oil, gas, and other hydrocarbons.  As a result, the Debtors need to process and make the Interest Owner Payments for the month of January 2025.

62.     The Debtors' continued satisfaction of the Interest Owner Payments is necessary, appropriate, and in the best interests of the Debtors, the Debtors' estates, and all other parties in interest in these chapter 11 cases. The Debtors have sufficient liquidity to pay the amounts described in this Motion in the ordinary course of business. Accordingly, it is my belief that the relief requested in the Royalty Motion is in the best interests of the Debtors', their estates, creditors, and parties in interest herein.

### H.      Cash Management Motion [Docket No. 17]

63.     Pursuant to the Debtors' *Emergency Motion for an Order (I) Authorizing the Debtors to (A) Continue Use of Existing Business Forms and Records, (B) Continue to Operate Their Cash Management System and Maintain Existing Corporate Bank Accounts, and (C) Continue Intercompany Transactions, (II) Waiving Certain U.S. Trustee Requirements, and (III) Granting Related Relief* (the "Cash Management Motion"), the Debtor's request that the Court (i) authorize the Debtors to: (a) continue using their existing checks and business forms; (b)

continue to operate their Cash Management System and maintain the Bank Accounts; and (c)

continue to engage in intercompany transactions, and (ii) grant related relief.

### i.   *The Cash Management System*

64.     The Debtors' Cash Management System (defined below) is comprised of the

following 12 bank accounts (collectively, the "Accounts" or "Bank Accounts"): 10 accounts at

Prosperity Bank; 1 account at VeraBank; and 1 account at Charles Schwab ending 6754.

65.     The Debtors intend to transfer any balance of funds deposited at VeraBank and

Charles Schwab into an existing account at Prosperity Bank and close the VeraBank and Charles

Schwab Accounts.  Otherwise, my belief upon consultation with the Debtors' management and

other professionals is that each of the Bank Accounts are generally in a financially stable banking

institution with the Federal Deposit Insurance Corporation or other appropriate government-

guaranteed deposit protection insurance.

66.     The Debtors manage their cash receipts, transfers, and disbursements through

routine inter-company deposits, withdrawals, and fund transfers to, from and between the Bank

Accounts by various methods including automated clearing house transfer, electronic funds

transfer, and digital and paper checks (the "Cash Management System").

67.     The following chart summarizes the roles of the key Bank Accounts:

| Financial Institution | Account Description |
| --- | --- |
| Prosperity Bank (6365) | Account ending 6365 is a deposit clearing account for oil and gas revenues. |
| Prosperity Bank (2140) | Account ending 2140 is the operating account for payroll and operating expenses, payment of working interest and royalties, and receives additional funds from Smackover to pay expenses. |
| Prosperity Bank (6373) | Account ending 6373 is the operating account for Oregon Ranch payroll and expenses; it receives funds from Smackover and O'Ryan Oil and Gas to pay expenses; it receives small miscellaneous revenues from timber programs / other. |

| Prosperity Bank (7077) | Account ending 7077 is an interest bearing account for excess funds. |
|---|---|
| Prosperity Bank (0128) | Account ending 0128 is a deposit account for oil and gas revenue and is used for disbursement of working interest and royalty payments. |
| Prosperity Bank (0144) | No activity. |
| Prosperity Bank (0136) | No activity. |
| Prosperity Bank (0185) | Account ending 0185 receives cash from O'Ryan Oil and Gas for monthly contract service fees and acts as an operating account for payments to contract field oil workers and payments for medical insurance |
| Prosperity Bank (6857) | No activity. |
| Prosperity Bank (7438) | No activity. |
| VeraBank (4094) | Account ending 4094 is an operating account for payments to contract field oil workers and payments for operating expenses. |
| Charles Schwab (6754) | Account ending 6754 is an interest bearing account for excess funds. |

68.     The Debtors' disbursements for payroll and other operating expenses are directed through the Prosperity Bank Accounts ending 2140, 6373, and 0185, and VeraBank Account ending 4094 (the "Payroll Accounts"). Such disbursements are made by online ACH transfers, electronic wire transfers, digital checks, and/or printed checks.

69.     The Debtors respectfully request authority to maintain their existing Bank Accounts and Cash Management System in accordance with their usual and customary practices to ensure a smooth transition into chapter 11 with minimal disruption to operations. In addition, the Debtors request authority to close any of the Bank Accounts or open new bank accounts if, in the exercise of their business judgment, the Debtors determine that such action is in the best interest of their estates. As noted above, the Debtors intend to close and transfer any and all funds deposited in the VeraBank and Charles Schwab Accounts into an Account maintained at Prosperity Bank. In

light of the other significant strains on the Debtors' personnel and resources during the coming weeks, the Debtors are concerned about unnecessary delay and disruption to the Debtors' business and a delay in receipt of funds needed for the Debtors' operations if the Debtors are required to make changes to the Cash Management System. In order to conduct their postpetition business, the Debtors need to be able to issue checks to vendors, service providers, employees, and others.

70.     By preserving business continuity and avoiding operational and administrative paralysis that closing the existing Bank Accounts and opening new ones would necessarily create, all parties-in-interest will be best served, and the benefit to the Debtors' estates will be considerable. To the best of the Debtors' knowledge, the Bank Accounts are in financially stable institutions that are insured by the FDIC up to the applicable limit. The confusion that would otherwise result could only work to the detriment of the Bankruptcy Cases. Accordingly, I believe the relief requested in the Cash Management Motion should be approved as the Debtors' exercise of sound business judgment for the benefit of the Debtors' estates, creditors, and parties-in-interest herein.

### ii.  The Debtors' Existing Business Forms

71.     In addition to the Cash Management System and Bank Accounts, the Debtors use in the ordinary course of their business numerous business forms (including but not limited to checks, deposit slips, letterhead, contracts, purchase orders, invoices and other business forms) (collectively, the "Business Forms"). The Debtors have a supply of these Business Forms on hand. It would be expensive, wasteful, and disruptive to the Debtors' business to destroy all of these Business Forms and order new ones. Opening a new set of books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay—particularly threatening to delay the payment of postpetition

claims and negatively affect operations and the values of these estates. Accordingly, it is my belief that authorization for the Debtors to continue using existing business forms is in the best interests of the Debtors', their estates, creditors, and parties-in-interest in these Chapter 11 Cases.

### iii.    Payroll and Tax Trust Accounts

72.    The Debtors also seek a waiver of the Guidelines requiring the establishment of specific debtor-in-possession accounts for payroll. The Debtors believe that their payroll obligations may be more efficiently met through their existing Cash Management System and their existing Bank Accounts, and that requiring the establishment of a new payroll account would be unnecessary and disruptive to its business.

73.    In addition, the Debtors seek a waiver of the Guidelines requiring debtors to establish specific debtor-in-possession accounts for tax payments and to deposit in such tax accounts sufficient funds to pay any tax liability (when incurred) associated with the Debtors' payroll. The Debtors believe that they can pay their tax obligations most efficiently from the existing Bank Accounts in accordance with their existing practices, and that the U.S. Trustee can adequately monitor the flow of funds into, between, and out of the Bank Accounts. The creation of new accounts designed solely for tax obligations would be unnecessary and inefficient. With the current system, the Debtors are current on their payroll tax obligations (except to the extent of any payroll tax obligations addressed in the Debtors' first day wage motion) and anticipate remaining current on such obligations.

### iv.   Waiver of Conflicting U.S. Trustee Guidelines or Provisions of Bankruptcy Code § 345(b)

74.    The Debtors request a waiver of the Guidelines to the extent that the requirements of such Guidelines otherwise conflict with (a) the Debtors' existing practices under the Cash Management System, or (b) any action taken by the Debtors in accordance with any Order granting

this Motion or other order entered in the Bankruptcy Cases.  The use of the Debtors' Cash Management System is an ordinary course, customary, essential business practice.  Requiring the Debtors to alter their current practices beyond the alterations already contemplated in the Motion to comply with the Guidelines would risk disruption to the Debtors' business and be inefficient.

75.      As discussed above, the Bank Accounts are and will be maintained with financial institutions that are financially stable.  The Debtors request a waiver of the requirement to comply with Bankruptcy Code § 345(b)'s investment guidelines, if necessary, as the deposit of funds in the Bank Accounts should not pose a substantial risk to the Debtors' estates or creditors. While the Debtors believe that their cash management practices comply with Bankruptcy Code § 345(b), to the extent that that the requirements of § 345(b) are inconsistent, or otherwise conflict, with (a) the cash management practices under the Cash Management Systems or (b) any action taken by the Debtors in accordance with an order of this Court, the Debtors seek a waiver of the requirements of § 345(b) to allow the Debtors to continue their existing cash management practices.  The Debtors will not place funds in accounts that are not insured by the FDIC.

76.      Due to the significant amounts of money that may be in the Bank Accounts from time to time, it would take a large amount of time for the Debtors to locate and determine, where necessary, appropriate alternative accounts that satisfy § 345(b).  Requiring the Debtors to further change their deposits and other procedures could result in harm to the Debtors, their estates, and creditors because such change would further disrupt the Cash Management System. Conversely, the Debtors' estates and creditors will not be harmed by the Debtors' maintenance of the status quo as modified by the relief requested herein because of the relatively safe and prudent practices already utilized by the Debtors.

77.     For each of the foregoing reasons, it is my belief that a waiver of the requirement

to comply with the investment guidelines set forth in § 345(b) should not pose any risk to the

Debtors' estates.

### v.   *Intercompany Transactions*

78.     In the ordinary course of business, the Debtors maintain business relationships with

each other, conducting intercompany transactions (collectively, the "Intercompany transactions")

from time to time that result in intercompany receivables and payables (the "Intercompany

Claims").   As set forth above, the Debtors manage their expenses and revenues through a

centralized Cash Management System.

79.     At any given time there may be Intercompany Claims owing by one Debtor to

another Debtor.  Intercompany Transactions are made periodically to reimburse certain Debtors

for various expenditures associated with their businesses or to fund certain Debtors' accounts in

anticipation of certain upcoming expenditures, as needed.  For example, in the operation of the

Cash Management System, the Debtors transfer funds into the Prosperity Bank Account ending

2140.  This type of Intercompany Transaction is used to make disbursements for payroll and

operating expenses, payment of working interest and royalties, and other expenditures necessary

to fund operating disbursements.

80.     The Intercompany Transactions are necessary due to the corporate structure of the

Debtors. This system not only maximizes efficiency but also simplifies third-party interactions

with the Debtors as an enterprise.  If the Intercompany Transactions were to be discontinued, the

Cash management System and the Debtors' operations would be unnecessarily disrupted to the

detriment of the Debtors, their creditors, and other stakeholders.  The Debtors thus submit that

continuing the Intercompany Transactions is essential and is in the best interests of the Debtors'

respective estates and creditors.  To minimize business disruptions and preserve value for the Debtors' estates, the Debtors seek authority to continue the Intercompany Transaction in the ordinary course of business postpetition, consistent with the Debtors' customary prepetition practices.

## I.        Cash Collateral Motion [Docket No. 26]

81.     The Debtors' use of Cash Collateral is critical to the preservation and maintenance of the value of the Debtors enterprise and their estates; therefore the Debtors seek the use of Cash Collateral for business operations and to avoid immediate and irreparable harm to their estates.  I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to use Cash Collateral and otherwise continue their business operations.  Therefore, I submit that the relief requested in the Cash Collateral Motion is in the best interests of the Debtors, their estates, creditors, and parties in interest, and is otherwise necessary to avoid immediate and irreparable harm.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing Declaration is true and correct to the best of my knowledge.

Dated: February 12, 2025                    By:  */s/ Brad Walker*
                                            Name: Brad Walker
                                            Title: Chief Restructuring Officer