Joshua N. Eppich (TBN 24050567)
Ken Green (TBN 24050698)
Eric T. Haitz (TBN 24101851)
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 529-2732 telephone
(817) 405-6902 facsimile
Email:  joshua@bondsellis.com
Email : ken.green@bondsellis.com
Email: eric.haitz@bondsellis.com

ATTORNEYS FOR AD HOC ROYALTY INTEREST OWNERS
GROUP

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| **SCANROCK OIL & GAS, INC.** *et al.* | § § | Case No. 25-90001-MXM-11 |
| Debtors. [1] | § § § § | Jointly Administered |

## EMERGENCY MOTION OF THE AD HOC ROYALTY INTEREST OWNERS GROUP FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF AN OFFICIAL COMMITTEE OF ROYALTY INTEREST OWNERS

> **Emergency relief has been requested. Relief is requested not later than 5:00 p.m. on March 20, 2025.  If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested**

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: O'Ryan Family Limited Partnership (1913); O'Ryan Production & Exploration Ltd. (9950); O'Ryan Ranches, Ltd. (7184); Ryan C. Hoerauf, Inc. (0493); Scanrock Oil & Gas, Inc. (0380); Smackover Oil Treaters, Ltd. (9529); O'Ryan Ponderosa, LLC (1476); Eon Production, LLC (0136). The location of the Debtors' service address is 8180 Lakeview Center, Ste. 300, Odessa, TX 79765.

> **in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The Ad Hoc Royalty Interest Owners Group,[2] by and through its undersigned counsel, submits this Motion (the "<u>Motion</u>") for entry of an order, substantially in the form attached as **<u>Exhibit A</u>**, directing the United States Trustee to appoint an official committee of royalty interest owners (the "<u>Official Committee of Royalty Interests Owners</u>").  In support of the Motion, the Ad Hoc Royalty Interest Owners Group respectfully states as follows:

**<u>PRELIMINARY STATEMENT</u>[3]**

1.       For nearly five years, the Debtors extracted and sold minerals they did not own; the Debtors pocketed the proceeds; and the Debtors funneled the cash off to pay expenses of insiders, Debtor affiliates, and non-Debtor affiliates—including mortgage payments and expenses on the Hill Country Ranch and Oregon Ranch. The Debtors' representative testified (twice) that oil and gas revenues were routinely siphoned away to sustain the ranches. These transactions are not ordinary intercompany transfers; they are a conversion of mineral interest owners' proceeds.  Yet, there is no estate fiduciary to represent the collective interests of mineral owners and to rectify the transgressions committed by the Debtors' prepetition management. This Motion lays bare the organizational and financial realities of the Debtors' corporate structure and allocation of assets and liabilities—an appreciation of which leads to the inevitable conclusion:  royalty interest owners' representation in these Chapter 11 Cases is woefully inadequate and this Court should direct the appointment of an Official Committee of Royalty Interest Owners.

---

[2]    As set forth in the Rule 2019 Statement [Docket No. 85] (the "<u>Verified Statement</u>"), the Ad Hoc Royalty Interest Owners Group holds undivided royalty interests pursuant to recorded leases by and between such owner and Debtor(s).

[3]    Capitalized terms used but not defined in this Preliminary Statement have the meanings ascribed to such terms elsewhere in this motion.

2.      The need for a dedicated royalty interest owners' committee is overwhelming, and the unique facts and circumstances of the Chapter 11 Cases clearly warrant the appointment of an Official Committee of Royalty Interest Owners.   Indeed, every factor courts consider when assessing the necessity of additional representation supports appointing an Official Committee of Royalty Interest Owners: (a) no existing party adequately represents royalty owners interests; (b) the Debtors operations, assets, and organizational structure are incredibly complex, opaque, and interwoven, making the Chapter 11 Cases irrefutably complex; (c) the cost of a separate committee is justified by the substantial value it will bring through oversight, asset recovery, and fair plan negotiations; and (d) an Official Committee of Royalty Interest Owners would add substantial value to the Chapter 11 Cases by providing critical input with respect to asset recovery, claim investigation, and negotiating chapter 11 plan terms on behalf of royalty owners, while maintaining a narrow scope of engagement, targeting the most important issues confronting royalty interest holders.

3.      *Without an Official Committee of Royalty Interest Owners, the royalty interest holders have no real representation in the Chapter 11 Cases*. The Debtors' fiduciary obligations to maximize value for all stakeholders are undermined by conflicting priorities—favoring management, insiders, and lenders at the direct expense of unpaid royalty owners. The Debtors rushed to provide excessive adequate protection to their secured lender, despite uncontroverted testimony that the lender already enjoys ample equity cushion. This was not a strategic business decision; it was an effort by the Debtors' principal, Mr. Hoerauf, to preserve his trophy ranches at the cost of other creditors.   Had royalty owners had meaningful representation from the outset, alternative approaches to cash collateral arrangements and plan negotiations could have been

pursued. Instead, they now find themselves sidelined, facing a process where their interests are treated as an afterthought.

4.      Moreover, a future official committee of unsecured creditors, if appointed, will not serve as an effective advocate for royalty owners. Such a committee's mandate is to maximize unsecured creditor recoveries generally, which could easily come at the direct expense of royalty owners. The unique nature of royalty claims, their statutory protections, and their distinct treatment in bankruptcy proceedings warrant separate, dedicated representation.  Without an Official Committee of Royalty Interest Owners, the royalty owners will lack the gravitas and funding afforded to an official committee to advance these goals and advocate effectively for royalty interest owners' rights.

5.      *These Chapter 11 Cases are undeniably complex*. The Debtors operate across several states, in multiple verticals, of several disparate, sophisticated, and highly-technical industries.  The hearings to date demonstrate that a central focus of the Chapter 11 Cases will be sale of assets to satisfy the Debtors' liabilities—a task which risks disparate creditor recoveries depending on the order asset sales, and the identification of claims and causes of action that can reclaim cash for the benefit of creditor constituencies of discrete Debtors.

6.      *The cost of appointing this committee is far outweighed by the value it will add*. It will focus on three core areas: (i) ensuring fair treatment in the claims and plan process, (ii) investigating and recovering diverted funds, and (iii) overseeing financial arrangements such as cash collateral usage. Without this representation, royalty owners risk being left with nothing while insiders and secured creditors maneuver for maximum benefit.

7.      The Debtors, their affiliates, and their insiders have turned these Chapter 11 Cases into a shield for misconduct—siphoning off royalty owners' money to fund luxury ranches while

leaving royalty owners unpaid. These Chapter 11 Cases are not a mere debt-maturity issue; they are a scheme to cabin off liabilities of royalty owners (and perhaps general unsecured creditors, for that matter) in an apparent attempt to preserve Mr. Hoerauf's wealth and his prestige ranch in Texas's hill country. This Motion is the first step toward undoing that scheme and ensuring that royalty owners have a voice in these proceedings.

8.      For the reasons set forth herein, the Court should order the immediate appointment of an Official Committee of Royalty Interest Owners.

## RELIEF REQUESTED

9.      By this Motion, the Ad Hoc Royalty Interest Owners Group seeks, pursuant to section 1102(a)(2) of title 11 of the United States Code (the "Bankruptcy Code"), entry of an order, substantially in the form attached as **Exhibit A**, directing the appointment of an Official Committee of Royalty Interest Owners.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

11.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

### A.    The Chapter 11 Cases

12.     On February 3, 2025 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases") and creating each of the Debtor's estates (each an "Estate" and collectively, the "Estates"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13.     On February 12, 2025, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to Use Cash Collateral; (ii) Granting Adequate Protection; (iii) Modifying the Automatic Stay; (iv) Scheduling a Final Hearing; and (v) Granting Related Relief* [Docket No. 26] (the "Cash Collateral Motion").

14.     This Court held a first-day hearing on February 13, 2025.  On February 14, 2025, the Court entered an interim order granting the relief requested in the Cash Collateral Motion on an interim basis [Docket. No. 54] (the "First Interim Cash Collateral Order").

15.     On February 28, 2025, the Ad Hoc Royalty Interest Owners Group filed their objection (the "Ad Hoc Group Objection") to the Cash Collateral Motion asserting their interests in the Debtors' cash and objecting to the gratuitous adequate protection offerings sought by the Cash Collateral Motion.

16.     On March 3, 2025, the Court held a second-day hearing.  On March 4, 2025, the Court entered a second interim order granting the relief requested in the Cash Collateral Motion on an interim basis [Docket No. 101] (the "Second Interim Cash Collateral Order" and together with the First Interim Cash Collateral Order, the "Interim CC Orders").

17.     For the reasons stated in the Ad Hoc Group Objection, the adequate protection requested by the Lender (as defined in the Cash Collateral Motion) provides protection to the Lender that grossly exceeds what is "adequate" to the determent of other holders of valid liens in the Debtors' cash (including holders such as mineral interest holders with liens in *higher priority*).

**B.     *The Debtors' Prepetition Operations***

18.     Prior to the Petition Date, only two or three of the Debtors had any substantial business operations—the FLP Debtor, the Smackover Debtor, and the RCH Inc. Debtor.

19.     At the Second Day Hearing the Debtors' CRO testified that—historically—the revenue-generating Debtors have funded the operations, expenses, and debt-service obligations of

the Debtors that own and operate the Oregon Ranch and the Hill Country Ranch.  He also acknowledged that this occurred while the Smackover Debtor refused, declined, or otherwise failed to make virtually any payments at all to royalty interest owners on account of the hydrocarbons owned by the royalty interest owners that the Debtors extracted and then sold.

20.     Although affiliate and insider transactions were acknowledged and sworn to by the Debtors, the Debtors' statements of financial affairs reflect substantially none of these transactions as transactions to or for the benefit of insiders.[4]

## C.     *Communications with UST and Debtors regarding Appointment of Official Committee of Royalty Owners*

21.     On March 11, 2025, Bonds Ellis (on behalf of the Ad Hoc Royality Interest Owners Group) conferred with counsel for the United States Trustee to discuss the appointment of an Official Committee of Royalty Interest Owners.  The Trustee has not rendered any determination on the relief requested in this Motion and takes no position on the Motion.

## BASIS FOR RELIEF

22.     The bases for the relief requested are section 1102(a)(2) of the Bankruptcy Code and rule 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[4]     It's unclear if this was intentional or unintentional.  Although it's possible that the Debtors CRO is not yet fully aware of the extent of insider transfers prior to the Petition Date, or that the Debtors' records kept a poor accounting of such, the dearth of insider transaction disclosure in the Debtors' Statement of Financial Affairs may also be attributable to the self-serving definition of "insider" that the Debtors proclaim in the Global Notes to the Debtors Schedule.

According to the Debtors' Global Notes, they jettisoned the definition of "insider" prescribed by the Bankruptcy Code, and instead adopted a much more favorable (and disclosure-reducing) definition that would miraculously make Debtor Scanrock Oil and Gas, Inc. not an insider of Debtor O'Ryan Ponderosa, LLC, despite the fact that they have the exact same equity ownership (100% Ryan Hoerauf, individually).  Under the Bankruptcy Code, identically-owned Debtors are clearly insiders of one another.  *See* 11 U.S.C. § 101(31)(E) ("The term 'insider' includes. . . (E) affiliate…"); *see also* 11 U.S.C. § 101(2)(B) ("The term 'affiliate' means . . . (B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote by the debtor, or by and entity that directly or indirectly owns, controls, or holds with power to vote 20 percent or more of the outstanding voting securities of the debtor…").

Under the Debtors' definition and apparent reporting scheme, any entity controlled by Mr. Hoerauf is likely excluded from insider transaction disclosure.

23.     Pursuant to section 1102(a)(2), "[o]n request of a party in interest, the court may

order the appointment of additional committees of creditors . . . if necessary to assure adequate

representation of creditors . . .. The United States Trustee shall appoint any such committee." 11

U.S.C. § 1102(a)(2).

24.     The Court retains absolute discretion to appoint an Official Committee of Royalty

Interest Owners under the facts and circumstances of the case even, if the U.S. Trustee previously

declined to do so. *See In re Sunedison, Inc.*, 556 B.R. 94, 102 (Bankr. S.D.N.Y. 2016) (quoting *In

re Williams Commc'ns Grp. Inc.*, 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002)); *In re Enron Corp.*,

279 B.R. 671, 684 (Bankr. S.D.N.Y. 2002).

25.     Section 1102(a)(2) does not define "adequate representation," virtually every court

and commentator interpreting this section have determined that the plain text of 1102(a)(2) renders

adequate representation the single most important factor.  *See* 7 Collier on Bankruptcy P 1102.02

n.35 (16th 2025).  " Nevertheless, courts have generally applied a similar set of factors in analyzing

the adequacy of representation. Such factors are: (a) the ability of the committee to

function; (b) the nature of the case; and (c) the standing and desires of the various constituencies."

*In re Enron Corporation*, 279 B.R. at 685 (citing *In re McLean Industries, Inc.*, 70 B.R. 852, 859

(Bankr. S.D.N.Y. 1987)).[5]

---

[5]    Other considerations have included:

a. The ability for creditors to participate in the case even without an official committee and the potential to recover
    expenses pursuant to § 503(b).  *In re Hills Stores*, 137 B.R. 4, 8 (Bankr.S.D.N.Y. 1992); *Albero v. Johns-
    Manville Corp. (In re Johns-Manville Corp.)*, 68 B.R. 155, 163 (S.D.N.Y. 1986).

b.    Whether different classes may be treated differently under a plan and need representation. *In re Drexel
    Burnham Lambert Group, Inc.*, 118 B.R. 209 (Bankr. S.D.N.Y. 1990).

c.    The motivation of movants, *In re Orfa Corp.*, 121 B.R. 294, 295 (Bankr.E.D.Pa. 1990).

d.    The tasks that a committee or separate committee is to perform. *McLean*, 70 B.R. at 860.

e.    Whether the appointment of an additional committee "is going to add something to the case." *See In re
    Sandridge Energy, Inc.*, Case No. 16-32488 (Bankr. S.D. Tex. Aug. 1, 2016) Hr'g Tr. at 94:10-12.

26.    No one factor is dispositive, and the weight attributed to each factor depends upon the facts and circumstances of each case. *In re Kalvar Microfilm*, 195 B.R. 599, 600 (Bankr. D. Del. 1996).

**A.    *An Official Committee of Royalty Interest Owners Is Necessary to Ensure Adequate Representation of Royalty Interest Owners***

27.    This is "not a case where the [royalty interest] holders . . . will be asked merely to vote on a plan [but rather] a case requiring active participation by [royalty interest] holders . . . to protect their interests." *In re Beker Industries Corp.*, 55 B.R. 945 (Bankr. S.D.N.Y. 1985).  The economic rights and interests of royalty interest owners are not protected by any fiduciary or other constituency in the Chapter 11 Cases—and in the absence of the appointment of an Official Committee of Royalty Interest Owners, royalty interest owners will be without any meaningful representation.

28.    The facts and circumstances facing the court in *In re Beker Industries Corp.* is particularly instructive.  The *Beker* court was asked to direct the appointment of a committee to serve as fiduciary for subordinated debenture holders.  55 B.R. 945. The court recognized that while "a significant portion [of debentures] may be held for their own account by institutions having the financial interest and means to represent themselves, the presence of at least 400 holders of small amounts indicates the need for their representation through an official committee having the fiduciary responsibility of acting on their behalf." *Id*. at 949.  The facts before this court are much the same: in the absence of the appointment of an Official Committee of Royalty Interest Owners, the overwhelming majority of royalty interest owners will lack adequate representation because there are scores of "holders of small" royalty interests, which "indicates the need for their representation through an official committee having the fiduciary responsibility of acting on their behalf." *Id*.; *See also In re Hills Stores*, 137 B.R. at 8 (constituency's inability to participate in the

absence of an official committee considered as a factor supporting appointment of official committee); *In re Johns-Manville Corp.*, 68 B.R. at 163.

29.     The core question for this Court, then, is whether some other constituency adequately represents the interests of royalty interest owners.  *In re Beker Industries Corp.*, 55 B.R. at 949 ("The statutory focus is on adequacy of representation. In a sense this is implicit in the statement from Collier's to the effect that a wide-spread holding shows the need for adequacy of representation."); *In re Sharon Steel Corp.*, 100 B.R. 767, 776 (Bankr. W.D. Pa. 1989) ("The focus of the statute is the necessity for the additional committee and the adequacy of the representation of the existing committee."); *In re Public Service Co.* 89 B.R. 1014, 1019 (Bankr.D.N.H. 1988) (same); *In re Republic Bank Corp.,* 95 B.R. 58 (Bankr.N.D.Tex. 1988) (same).

   i.   <u>An Official Committee of Unsecured Creditors Cannot Adequately Represent the Interests of the Royalty Interest Owners</u>

30.     As a threshold matter, to date, no Creditors' Committee has been appointed.  So, perhaps it goes without saying no existing committee can adequately represent the interests of Royalty Interest Owners.

31.     However, even assuming a Creditors' Committee were appointed, the Creditors' Committee is not positioned or incentivized to maximize value for royalty interest holders, as its role is limited to ensuring that general unsecured creditors achieve maximum value for their claims. A Creditors' Committee is a fiduciary for general unsecured creditors. In its efforts to maximize recoveries for unsecured creditors, the Creditors' Committee may seek to trade higher general unsecured claim recoveries (or premiums) for little or no recoveries to royalty owners.

32.     The "chief concern of adequacy of representation is whether it appears that different classes of debt and equity holders may be treated differently under a plan and need representation through appointment of additional committees." *In re Drexel Burnham Lambert Group*, 118 B.R.

209, 212 (Bankr. S.D.N.Y. 1990) (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 401 (1977),

U.S. Code Cong. Admin. News 1978, p. 5787); *see also McLean*,70 B.R. at 861*; In re Beker Ind.*

*Corp.*,55 B.R. 945 (Bankr.S.D.N.Y. 1985)*.*

33.    Here, the royalty owners' claims will be treated differently because royalty owners'

claims are siloed in the Debtors organizational structure.   Indeed, royalty owners have been

scheduled as having claims against the Smackover Debtor (defined below), a completely separate

entity and organizational structure from the Debtor that the overwhelming preponderance of the

general unsecured creditors have claims against.   The Debtors assert that the liabilities owing to

royalty interest owners are substantially owed by Smackover Oil Treaters, Ltd. (the "Smackover

Debtor").   *See e.g.*, Smackover Debtor Sch. E/F at Case No. 25-90007 Docket No. 16 pp. 15-75

(listing royalty interest owners).[6]  Meanwhile, the substantial majority of the Debtors' (non insider,

non-affiliate) general unsecured creditors' claims are scheduled under Ryan C. Hoerauf, Inc. (the

"RCH Inc. Debtor").   *See e.g.*, RHC Inc. Debtor Sch. E/F at Case No. 25-9006 Docket No. 17 pp.

25-130.   The diagram below illustrates the dispersion of royalty interest claims as compared to

general unsecured claims:[7]

---

[6]    Although the royalty interest owners' claims are scheduled as unsecured, as set forth in the Ad Hoc Royalty
Interest Owners Group's [Docket No. 86] objection to the Debtors' cash collateral motion [Docket No. 26],
royalty interest owners assert that they are not unsecured claimants and have various bases for asserting
statutory and other lien interests.

[7]    A full size copy of this diagram is attached hereto as **Exhibit B**.  As parties can likely appreciate, this diagram
was prepared in a short timeframe.  The movant will continue to review and validate the summary of unsecured
claims annotated in this diagram, and to the extent any material discrepancy is discovered, file an updated
Exhibit B.



Parties seem to (presently) agree that the most valuable asset of the Debtors is the Oregon ranch (the "Oregon Ranch"), fee simple to which is owned by non-Debtor O'Ryan Ranches, LLC (the "OR Ranch Non-Debtor"). *See* Case No. 25-90003 Docket No. 15 at p. 16 (listing OR Ranch Non-Debtor as 100% owner of Ochoco Ranch Land).[8]   Although it seems unlikely that any residual equity would flow from the sale of the Oregon Ranch to O'Ryan Family Limited Partnership (the "FLP Debtor"), it is clear that any cash that could ultimately be upstreamed from the OR Ranch Non-Debtor to the FLP Debtor will ultimately likely be inaccessible to satisfy the unpaid royalty interest owners owed by the Smackover Debtor—or at least that's the position that the Debtors appear poised to take. Indeed, how could the Debtors propose to push cash <u>down</u> from the FLP Debtor to the Smackover Debtor when the FLP Debtor has approximately $37 million in unsecured claims scheduled as outstanding?

34.   Moreover, an unsecured creditors committee will be disinclined to (and have no reason to) seek to push cash <u>down</u> from the FLP Debtor, or <u>across</u> from any of the other Debtors

---

[8]   The other non-Debtor O'Ryan Oregon Ranches, LLC appears to own the personal property assets at the Oregon Ranch.

(for that matter), because it does not behoove creditors of the RCH Inc. Debtor to siphon cash away from the RCH Inc. Debtor (or direct cash to flow toward any other entity). Even assuming, *arguendo*, that a creditors' committee is ultimately impaneled that comprises of representatives from several of the Debtors—none will adequately represent that royalty interest owners as the royalty interest owners are siloed in to but one of the Debtor entities with no money that can flow up from subsidiary asset sales, subsidiary revenues, or other asset liquidation. Therefore, it is abundantly clear "that different classes of debt and equity holders may be treated differently under a plan" and the royalty owners "need representation through appointment of additional committees." *In re Drexel Burnham Lambert Group*, 118 B.R. at 212.

35.    It is a confluence of damning facts and circumstances (and historical transgressions by management and insiders) that now lead to the inevitable conclusion: an Official Committee of Royalty Interest Owners must be constituted. Such facts and circumstances include:

    a. The location in the organizational structure of the Debtors' key assets;

    b. The location in the organizational structure of the royalty interest owners' claims;

    c. The location in the organizational structure of the overwhelming bulk of general unsecured claims; and

    d. The longstanding crusade that the Debtors' management to siphon cash from the revenue-generating entities (*i.e.*, the RHC, Inc. Debtor and the Smackover Debtor) to fund insiders (*e.g.*, Mr. Hoerauf and his family members), affiliates (*e.g.*, the OR Ranch Non-Debtor), and other Debtors (*e.g.*, O'Ryan Ranches, Ltd. (Llano Ranch)).

Accordingly, there is ample reason that this Court should exercise its discretion to direct the appointment of the Official Committee of Royalty Interest Owners. Only an Official Committee of Royalty Interest Owners can protect royalty interest owners' substantial legal and economic interests.

    ii.    <u>The Debtors' Management Cannot Zealously Represent the Interests of the Royalty Owners</u>

36.    The Debtors' principal, Mr. Hoerauf, is horribly conflicted and cannot adequately represent the interests of royalty interest owners. His personal interests all but guaranty that he will silo liabilities and minimize recoveries to unsecured creditors and to royalty interest owners. For example, from Mr. Hoerauf's perspective, the asset poor and liability heavy Smackover Debtor is no cause for concern. If Mr. Hoerauf is able to cram down the royalty interest owners, and walk away from his equity stake in the RCH, Inc. Debtor (where the overwhelming balance of non-insider, non-affiliate general unsecured claims are), the substantial balance of remaining non-affiliate, non-insider general unsecured claims would be a manageable sum for him to reconcile on a debtor-by-debtor basis—all from the comfort of his substantially unencumbered Hill Country Ranch.[9] Of course, this requires Mr. Hoerauf to turn a blind eye to the apparent ordinary-course looting of the oil and gas revenues that have been siphoned from the revenue-generating Debtors to subsidize the Oregon Ranch mortgages and operations, and the Hill Country Ranch mortgages and operations. Royalty interest owners (and this Court) cannot bet on Mr. Hoerauf.

37.    And unfortunately, the Debtors' CRO cannot wrangle with these difficult issues with any more vigor. Indeed, the Debtors' CRO cannot pursue a sale of the Hill Country Ranch

---

[9]    According to the Debtors testimony, and representations of counsel for the oil and gas Debtors, the Debtors intend to sell the Oregon Ranch for approximately $68 million, which is expected to pay off the Lender's debt (or very nearly pay off the Lender's debt with a very small stub)—leaving the Hill Country Ranch substantially unencumbered.

without Mr. Hoerauf's approval.  *See* CRO Engagement Letter at Docket No. 102 ¶ 10.g.  And it

is not clear from the CRO's engagement whether the CRO can unilaterally decide to pursue actions

against insiders or affiliates to recoup cash for the benefit of various of the creditor constituencies

such as the royalty interest owners.  *See id.* at *passim*.

38.     Accordingly, the royalty interest owners' interests are not adequately represented

in the Chapter 11 Cases, and this Court should direct the appointment of a committee to ensure

that there is a fiduciary advocating for their legal and economic interests.

iii.    <u>The Functioning of an Unsecured Creditors Committee Is Rendered Irrelevant by
the United States Trustee's Policy of Declining to Seat a Partially-Secured Creditor
on an Official Committee of Unsecured Creditors</u>

39.     A "strong indicator of whether a committee is able to adequately represent its

constituents is its ability to function. A committee that is hopelessly divided, unable to take a

position on important matters and ineffective would clearly support an argument for a separate

committee."  *In re Enron Corporation*, 279 B.R. 671, 686 (Bankr. S.D.N.Y. 2002).  Courts analyze

this factor because the presumption is that a functioning committee necessarily represents the

interests of its constituents.  However, this logic falls apart when—as is the case here—the U.S.

Trustee declines to seat a large swath of unsecured creditors (royalty interest holders among them)

on an official committee of unsecured creditors lest such holders (royalty interest holders among

them) disavow the secured portions of their claims.  In other words, ***a committee that includes
royalty interest holders could exist only at the expense of royalty interest holders' rights***.  That's

not a functioning committee representing the panoply of creditors.  It's an abdication of one's own

rights for the privilege of advocating for another's' rights. The *Dow Corning* court put it nicely:

> The problem is that a committee may function just fine, reaching
> consensus on all issues, and still not adequately represent a
> particular group of creditors. This can occur, for instance, if the
> committee is so dominated by one group of creditors that a separate
> group has virtually no say in the decision-making process.

> Consequently, courts look to see whether conflicts of interest on the committee effectively disenfranchise particular groups of creditors.

*Dow Corning Corp.*, 194 B.R. 121, 142 (Bankr.E.D.Mich. 1996), rev'd on other grounds, 212 B.R. 258 (E.D.Mich. 1997).

40.    Here, an official committee of unsecured creditors will not—indeed cannot—adequately represent the interests of royalty owners.  According to the United States Trustee:

> When soliciting creditors, U.S. Trustees seek to elicit information sufficient to evaluate a creditor's eligibility to serve while ***avoiding appointments of those unsuited or unqualified for service***. In addition to considering the size and nature of the creditor's claim, ***U.S. Trustees seek to determine whether a candidate for committee membership has a potentially disqualifying conflict or status***. Although it is difficult to define precisely what may be disqualifying outside the confines of a particular case, U.S. Trustees consider whether the creditor has executed any agreement limiting its ability to act as a fiduciary or to consider more than one plan, such as an inter-creditor agreement or "lock-up" agreement with the debtor. ***Other considerations include whether the creditor*** will be paid as a critical vendor, has an executory contract or lease that will be assumed (and defaults cured), ***holds claims among multiple levels of the company's debt structure***, or has insurance or other hedges that may limit its exposure or affect the identity of the true beneficial holder of the claim.

*See* "Committee Formation and Reformation: Considerations and Best Practices" *ABI Journal (Vol. XXX, No. 8, October 2011)*; *see also* "Committee Formation and Reformation: Considerations and Best Practices" Archives, U.S. Dept. of Justice (October 1, 2011) [https://www.justice.gov/archives/ust/blog/committee-formation-and-reformation-considerations-and-best-practices].[10]

---

[10]    Of course, the royalty interest owners likely have wholly secured claims.  In such a case, royalty interest owners are barred from serving on the unsecured creditors committee at all.  "If wholly secured, the Debenture holders are thus ineligible for membership on the unsecured creditors committee. Indeed, the unsecured creditors have refused to admit them to membership on the unsecured creditors committee. " *In re Beker Industries Corp.*, 55 B.R. at 949.

41.     In other words, the Department of Justice instructs trustees to avoid putting creditors situated like partially-secured royalty intertest owners on the official committee of unsecured creditors, and the Bankruptcy Code prohibits wholly-secured creditors from being seated on a Creditors' Committee.[11]   Consequently, when this Court "look[s] to see whether conflicts of interest on the [unsecured] committee effectively disenfranchise" royalty owners, it will quickly discover that royalty interest owners (whose claims are scheduled against the Smackover Debtor) are not aligned with general unsecured creditors (whose claims are overwhelming scheduled against the RCH, Inc. Debtor). Accordingly, royalty interest owners interests cannot possibly be adequately represented by a Creditors' Committee.[12]

## B.     The Chapter 11 Cases Are Complex (i.e., the Nature of the Case)

42.     "It has been recognized that certain complex, multi-debtor, multi-business cases lend support for the appointment of additional committees."  *In re Enron*, 279 B.R. at 689; *see e.g. In re Hills Stores Co.*, 137 B.R. at 5 (complex multi-business debtors may need more than one committee).  There is no doubt that the Chapter 11 Cases are complex. The Chapter 11 Cases involve eight debtors, operating across several states, in multiple verticals, of several disparate, sophisticated, and highly-technical industries.  The Debtors own luxury real estate; they trade, sell, or bargain for carbon credits; they own oil and gas assets; they operate oil and gas interests; and they sell minerals.  And that list accounts for but four of the eight debtors.

---

[11]   "If wholly secured, the Debenture holders are thus ineligible for membership on the unsecured creditors committee. Indeed, the unsecured creditors have refused to admit them to membership on the unsecured creditors committee. " *In re Beker Industries Corp.*, 55 B.R. at 949.

[12]   Its also worth noting that it appears that the Debtors' estimation of unpaid royalty interest owners' claims substantially undervalues the amount owed to them.  Upon information and belief, the Debtors' figures and calculations (and perhaps records) exclude documentation as to the proceeds from the sale of gas and condensate associated with the sale of oil.  Accordingly, the $6 million amount suggested by the Debtors in their first day declaration is likely much greater.  The investigation and correction of this error is yet another basis for directing the appointment of an Official Committee of Royalty Interest Owners.

43.    The Debtors' capital structure is equally complicated.   Their capital structure consists of over $71 million in total debt—excluding insider and affiliate debt.   The Lender has asserted that it is owed in excess of $50.1 million in secured debt.   *See* Docket No. 101 at ¶ F.a. Oil and gas creditors are likely to assert mineral liens under the Texas Property Code.   The Debtors are not uniformly under common ultimate ownership (*see* Docket No. 28 at ¶ 15), nor are all of their liabilities mutually guaranteed (*see* Debtors' Schedules at *passim*).   And to further add to the complexity, all of the above liabilities are overlapping obligations of non-Debtor affiliates and non-Debtor subsidiaries with the extent of such interwovenness being incredibly opaque (and yet to be fully explained).

44.    To be clear, although the dollar amount of the Chapter 11 Cases is significant, the dollar amount at stake is far from the most complicating factor in the Chapter 11 Cases.   Indeed, cases far larger than the Chapter 11 Cases are far less complex.   Here, the issue is the web of pledges to the secured lenders, complicated by the interplay of UCC liens, *and* mineral liens, *and* mechanic's liens, *and* oil and gas liens—all complicated further yet by (a) the siloing of general unsecured creditors (generally) and royalty claims in to two Debtor entities in unconnected organizational structures, (b) a checkered history of gratuitous transfers among insiders and affiliates as a matter of ordinary business practice,[13] and (c) management with every incentive to silo liabilities to enrich Mr. Hoerauf and every intention to maintain control of his fiefdom.   *See e.g.*, *See* CRO Engagement Letter at Docket No. 102 ¶ 10.g (Debtors' prior management maintaining decision-making authority as to asset sales).

---

[13]    The CRO for the Debtors has now twice testified that it has been the Debtors ordinary practice prepetition to fund mortgage and operational expenses at the Oregon ranch and the Hill Country ranch through revenue generated by the oil and gas Debtors.

45. Fraudulent transfers to co-Debtors, non-Debtors, insiders and affiliates will be a core issues in the Chapter 11 Cases. The web of transactions and segregation of royalty interest owners' claims vis-à-vis general unsecured creditors' claims alone introduce complexities that merit the appointment of an Official Committee of Royalty Interest Owners.

46. Finally, the most obvious nature of this case is this: the Debtor entities were specifically chosen seek relief under chapter 11 because they otherwise faced certain foreclosure by the Lender. If the Oregon Ranch sells, and the Lender is paid in full, all creditors should fear that the O'Ryan Ranches, Ltd. (Llano Ranch) Debtor (the "Ranches Debtor") may seek to dismiss its chapter 11 case.[14] Indeed, the sole meaningful debt scheduled by the Ranches Debtor is the Lender's first lien debt. *See* Case No. 25-40434 Docket No. 19 (scheduling $80,000 in liabilities other than the Lender's debt). A royalty committee—whose constituent members (by the Debtors own testimony) have historically funded the operations and expenses of the Ranches Debtor—are best positioned to ensure that appropriate claims and causes of action are asserted against affiliates and insiders (such as the Ranches Debtor) for the benefit of royalty owners. No other constituency or constitution of committees hold comparable interests, and no other constituency can adequately represent the interests of royalty interest owners adequately. Mr. Hoerauf will be willing to keep his ranch at the expense of general unsecured creditors; and general unsecured creditors will be willing to let him at the expense of royalty interest owners.

## C. The Need for an Official Committee of Royalty Interest Owners Outweighs Potential Costs

47. The Ad Hoc Royalty Interest Owners Group has clearly established the need for an Official Committee of Royalty Interest Owners in the Chapter 11 Cases. Once the need for

---

[14] What other intention could the Debtors have had in retaining separate counsel for the Ranches Debtor than to avoid the conflict that would inevitably arise when requesting dismissal of only the Ranches Debtor chapter 11 case?

adequate representation for royalty interest owners is established, the "burden shifts to the opponent of the motion to show that the cost of the additional committee sought significantly outweighs the concern for adequate representation and cannot be alleviated in other ways." *See Beker Indus.*, 55 B.R. at 949.

48.     The Ad Hoc Royalty Interest Owners Group understands that the scope of its role in the Chapter 11 Cases must be tailored to its purpose. The Official Committee of Royalty Interest Owners would focus on those issues that most impact the royalty interest owners—the recovery of unpaid royalty payments for the benefit of royalty interest owners; negotiating the terms of a chapter 11 plan that treats the royalty owners equitably; and oversight over the value-maximizing authorization to use cash collateral (and if ultimately pursued, oversight over the value-maximizing debtor-in-possession financing facility). And the Ad Hoc Royalty Interest Owners Group is willing to work within a reasonable, mutually agreeable budget to achieve these objectives. With a narrow focus, the Official Committee of Royalty Interest Owners can avoid unnecessary duplication of efforts with any other appointed creditors' committee. The cost of allowing the Official Committee of Royalty Interest Owners to pursue these issues is justified given the need for adequate representation and the material prejudice to royalty interest owners if they do not have representation would be irreparable.

**D.     *The Appointment of an Official Committee of Royality Interest Owners Adds Value to the Chapter 11 Cases***

49.     Some Courts have added an extra factor to its analysis to assess, as a practical matter, whether the Official Committee of Royalty Interest Owners would "add" anything to the Chapter 11 Cases. The appointment of a fiduciary who will act on behalf of the royalty interest owners is the only way to ensure that the bankruptcy process works fairly and justly to maximize value for all stakeholders, not only the creditors of the RCH, Inc. Debtor or other unsecured

creditors. *See, e.g.*, *In re Oneida Ltd.*, No. 06-10489 (ALG), 2006 1288576, at *3 (Bankr. S.D.N.Y.

May 4, 2006) (finding that "due regard for appearances also warrant[ed] the appointment of an

equity committee, if only to dispel any implication that, here, a group of creditors took control of

the Board of Directors in the first stage of a two-stage restructuring, neutralized the general

unsecured creditors and then took for itself the value of the remaining equity."). As detailed above,

no other party is currently in a position to advocate for the interests of royalty interest holders.

Neither the Debtors nor any unsecured creditors' committee are aligned with royalty interest

holders. Only the Official Committee of Royalty Interest Owners can effectively represent the

interests of royalty interest holders and give further legitimacy to the proceedings by giving royalty

owners a voice.  After all, it is the royalty owners who have, for years, subsidized the expenses

and operations of the Estates' most valuable assets—the Oregon Ranch and the Hill Country

Ranch.

50.    The importance of representation for royalty interest holders is further pronounced

given the novelty and disparity of the Debtors' assets, and the complexity (and conflictedness) of

the Debtors' organizational structure. Having access to their own advisors and experts will be

helpful inputs for this Court to make a reasoned and just determination as to the rights, interests,

and entitlements of the royalty interest owners. In addition, royalty interest owners are in need of

representation to negotiate the terms of a chapter 11 plan. And given the divergent interests of

royalty interest owners from the Debtors and other stakeholders, having input on these casecritical

issues is essential.

51.    In addition, the Ad Hoc Royalty Interest Owners Group has already been substantial

involved in the Chapter 11 Cases—contesting the terms of adequate protection to the Debtors'

prepetition lenders and seeking immediate discovery to commence a challenge to liens (or

negotiate an extension to do so) and further rebuff overly-rich adequate protection offerings from the Debtors.  And the Ad Hoc Royalty Interest Owners Group can be more effective when appointed in an official capacity.

## EMERGENCY RELIEF IS WARRANTED

52.     The Final Hearing on the Cash Collateral Motion is set on March 31, 2025.  The deadline for parties in interest to object has been set on March 24, 2025.  Given the nature of the relief requested by the Cash Collateral Motion, it is imperative that an Official Committee of Royalty Interest Owners be entitled to object to certain of the provisions of the Cash Collateral Motion and weigh in on the Budget (as defined in the Cash Collateral Motion).  Accordingly, the relief requested in this Motion is needed prior to the objection deadline lest the to-be-formed committee be stripped of significant rights by the entry of an order approving the relief requested by the Cash Collateral Motion.

## RESERVATION OF RIGHTS

53.     Nothing contained in this Motion shall be deemed or construed to be an admission of the classification, extent, or priority of any claim or interest held by any royalty interest owner or any member of the Ad Hoc Royalty Interest Owners Group.  The Ad Hoc Royalty Interest Owners Group explicitly reserves the all of its rights and claims as to the mineral interests, the Debtors' assets (including cash), third-party assets (including cash), and further reserves the right to assert a claim or application for administrative expense priority against any Debtor—notwithstanding the scheduling of such claims by the Debtors or the discussion of such scheduled claims in this Motion. All rights are reserved.

## CONCLUSION

54.     The factors make clear that an Official Committee of Royalty Interest Owners is needed. The Debtors and Lender have set a right timeline for challenges, they're seeking to waive

marshalling, and by all appearances, they seem content with the siloed royalty liabilities.  But the routine siphoning of royalty owners' cash by the Debtor affiliates, insiders, and non-Debtor affiliates ensures that there is substantially more value that may be distributed to royalty owners than what assets are listed on the Smackover Debtor's schedules. With the appointment of the Official Committee of Royalty Interest Owners, the table can be reset and the terms of a chapter 11 plan of reorganization that allocates the immense value of the Debtors' estates appropriately can be negotiated.

55.     The complexity of the business, legal, and operational issues, and the fact that no other fiduciary is aligned or incentivized to maximize royalty interest owner recoveries necessarily requires that the royalty interest holders are appointed their own representative in an official capacity to act as a fiduciary in assessing value and negotiating the terms of the chapter 11 plan.

56.     However, in order to have a seat at the table with respect to these matters, it is essential that the Official Committee of Royalty Interest Owners be constituted now and begin its work quickly.

57.     For the reasons set forth above, the Ad Hoc Royalty Interest Owners Group submits that the Court should immediately direct the appointment of the Official Committee of Royalty Interest Owners in these cases.

WHEREFORE, the Ad Hoc Royalty Interest Owners Group respectfully requests that the

Court enter an order, substantially in the form attached as **Exhibit A**, directing the appointment of

the Official Committee of Royalty Interest Owners.

Dated: March 12, 2025                     Respectfully submitted,

*/s/ Eric T. Haitz*
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
Joshua N. Eppich (Texas Bar No. 24050567)
Eric T. Haitz (Texas Bar No. 24101851)
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: joshua@bondsellis.com
Email: eric.haitz@bondsellis.com

-and-

Ken Green (Texas Bar No. 24050698)
402 Heights Blvd.
Houston, Texas 77007
(713) 335-4990 telephone
(713) 335-4991 facsimile
Email: ken.green@bondsellis.com

COUNSEL FOR THE AD HOC ROYALTY
INTEREST OWNERS GROUP

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has transmitted a true and correct copy of the foregoing via the Court's Electronic Case Filing system to all persons participating therein on March 12, 2025.

*/s/ Eric T. Haitz*
Eric T. Haitz

## <u>CERTIFICATE OF CONFERENCE</u>

The undersigned hereby certifies that on March 11, 2025 and March 12, 2025, he conferred with counsel for the United States Trustee. As of the filing of this Motion, the Trustee does not take any position on the relief requested herein.

No other interested parties were conferred with because the number of responding parties may be too numerous to contact prior to the filing of the motion.

*/s/ Eric T. Haitz*
Eric T. Haitz

**EXHIBIT A**

*Proposed Order*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **SCANROCK OIL & GAS, INC.** *et al.* | § | **Case No. 25-90001-MXM-11** |
| | § | |
| **Debtors.** [15] | § | **Jointly Administered** |
| | § | |
| | § | |

**ORDER GRANTING EMERGENCY MOTION OF THE AD HOC ROYALTY INTEREST OWNERS GROUP FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF AN OFFICIAL COMMITTEE OF ROYALTY INTEREST OWNERS**

---

[15] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: O'Ryan Family Limited Partnership (1913); O'Ryan Production & Exploration Ltd. (9950); O'Ryan Ranches, Ltd. (7184); Ryan C. Hoerauf, Inc. (0493); Scanrock Oil & Gas, Inc. (0380); Smackover Oil Treaters, Ltd. (9529); O'Ryan Ponderosa, LLC (1476); Eon Production, LLC (0136). The location of the Debtors' service address is 8180 Lakeview Center, Ste. 300, Odessa, TX 79765.

The Court, having considered the *Emergency* Motion of the Ad Hoc Royalty Interest Owners *Group Group for Entry of an Order Directing the Appointment of an Official Committee of Royalty Interest Owners* (the "Motion"), and finding good cause therefor, and for the reasons stated on the record, it is hereby:

ORDERED that the Motion is granted as set forth herein (the "Order"); and it is further

ORDERED that the U.S. Trustee shall appoint an official committee of royalty interest owners in the chapter 11 cases as expeditiously as possible; and it is further

ORDERED that this Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# # # END OF ORDER # # #

Order Submitted By

Joshua N. Eppich (TBN 24050567)
Ken Green (TBN 24050698)
Eric T. Haitz (TBN 24101851)
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 529-2732 telephone
(817) 405-6902 facsimile
Email:  joshua@bondsellis.com
Email : ken.green@bondsellis.com
Email: eric.haitz@bondsellis.com

ATTORNEYS FOR AD HOC ROYALTY INTEREST OWNERS GROUP

**EXHIBIT B**
*Full Size Demonstrative*

