Eric M. English
Texas Bar No. 24062714
M. Shane Johnson
Texas Bar No. 24083263
Jack M. Eiband (*pro hac vice* forthcoming)
Texas Bar No. 24135185
Adriana T. Young
Texas Bar No. 24138188
**PORTER HEDGES LLP**
1000 Main St., 36th Floor
Houston, TX 77002
Tel: (713) 226-6000
Fax: (713) 226-6248
eenglish@porterhedges.com
sjohnson@porterhedges.com
jeiband@porterhedges.com
ayoung@porterhedges.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SCANROCK OIL & GAS, INC., *et al.*, | § | Case No. 25-90001-mxm11 |
| | § | |
| Debtors.[1] | § | Jointly Administered |

**THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS' LIMITED JOINDER AND STATEMENT IN SUPPORT OF
THE UNITED STATES TRUSTEE'S MOTION TO APPOINT CHAPTER 11 TRUSTEES**

TO THE HONORABLE MARK X. MULLIN, U.S. BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "Committee") hereby files this Limited Joinder and Statement in Support (the "Committee's Statement") of the *United States*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Scanrock Oil & Gas, Inc. (0380); O'Ryan Family Limited Partnership (1913); O'Ryan Production & Exploration Ltd. (9950); Ryan C. Hoerauf, Inc. (0493); Smackover Oil Treaters, Ltd. (9529); O'Ryan Ponderosa, LLC (1476); EON Production, LLC (0136); and O'Ryan Ranches, Ltd. (7184) (collectively, the "Debtors"). The location of the Debtors' service address is 8180 Lakeview Center, Ste. 300, Odessa, TX 79765.

1

17195761

*Trustee's Motion to Appoint Chapter 11 Trustees* [Docket No. 183] (the "Motion").[2] In support of the Committee's Statement, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. As noted in other pleadings, the Committee is negotiating to implement changes to these cases to address the structural conflicts and management issues raised by the U.S. Trustee. The Committee agrees that Mr. Hoerauf should not be in control of these Debtors and has proposed that a Chief Restructuring Officer be given full control over all Debtors. Absent the Debtors' agreement to vest Mr. Walker (or another CRO) with such authority, file the entities that own the Oregon ranch, and substantively consolidate the Debtors, the Committee supports appointment of a single chapter 11 trustee.

2. The Motion proposes appointment of separate trustees for each of the Smackover Oil Treaters, Limited ("Smackover"), Ryan C. Hoerauf, Inc. d/b/a O'Ryan Oil & Gas ("RCH"), and O'Ryan Family Limiped Partnership ("FLP") estates based on potential conflicts of interest between the estates. The Committee does not support the appointment of *three* trustees, which is too expensive and burdensome in a case with extremely limited liquidity. Three trustees will impose costs that will reduce recoveries for creditors and will also frustrate administration of the estates because their appointment would do nothing to quell any conflicts of interest between these estates that are ultimately all owned (directly or indirectly) by Mr. Hoerauf.

3. Substantive consolidation is a better solution in these cases. The Debtors' operations and finances are fundamentally intertwined, as demonstrated by the pervasive commingling of assets, systematic disregard for corporate formalities prior to the Petition Date (as defined below), and the inability of professionals to reconcile the Debtors' books and records.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2

17195761

Under either the traditional multi-factor test or the balancing of harm test recognized in the Northern District of Texas, consolidation is justified to avoid excessive administrative costs and ensure fair treatment of all creditors. The relief would prejudice no party—secured creditors remain oversecured while unsecured creditors gain access to pooled assets that might otherwise be unavailable—and would correct the inequities resulting from the Debtors' misconduct. Substantive consolidation combined with liquidating the Oregon and Llano ranches offers the most equitable and efficient resolution for these estates.

4.     In addition to substantive consolidation, Mr. Hoerauf is ill-suited to maintain control over the Debtors because of how he operated the Debtors prepetition as a single company with poor business records, numerous insider transactions, and risky operational decisions for the oil and gas entities. Mr. Walker has not been empowered to run the Debtors without deferring to Mr. Hoerauf, and Mr. Hoerauf has not been willing to step aside, especially in his decision-making role with the oil and gas Debtors.

5.     Accordingly, the Committee supports substantive consolidation of the estates and the appointment of a single chapter 11 trustee over the consolidated estates.

**RELEVANT BACKGROUND**

6.     On February 3, 2025, Scanrock Oil & Gas, Inc. and O'Ryan Ranches, Ltd. filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.

7.     On February 9, 2025, (collectively with February 3, 2025, the "Petition Date") the remaining Debtors filed for relief under chapter 11 in this Court, and for the Debtors to be jointly administered. Ryan C. Hoerauf ("Mr. Hoerauf"), the Debtors' principal, signed each of the voluntary petitions, but the Debtors hired Chief Restructuring Officer Brad Walker ("Mr. Walker")

3

17195761

on January 29, 2025, prior to the Petition Date. Mr. Walker, however, lacks authority over key non-Debtor ranch entities, including O'Ryan Ranches LLC and O'Ryan Oregon Ranches LLC, which own the Oregon Ranch, as he expressly confirmed he is not their CRO. *See Declaration of Brad Walker in Support of Debtors' Chapter 11 Petitions and First-Day Motions* (the "First Day Declaration"), ¶ 2 n.2 [Docket No. 28].[3] Under the current arrangement, Mr. Walker lacks the authority to either establish the list price for the Oregon Ranch or accept an offer for the Oregon Ranch. Additionally, if the Oregon Ranch were sold, Mr. Walker would not have any control over the distribution of the sale proceeds. *See* Transcript of Hearing Held March 10, 2025, 61:8-10 [Docket No. 188].

8.      Prior to the retention of Mr. Walker, Mr. Hoerauf was responsible for managing the Debtors' businesses and presided over systemic financial mismanagement, including the accumulation of $10.5 million in unsecured debt and $6 million in unpaid royalties. *See id.* at ¶¶19–20. His prepetition diversion of oil and gas proceeds to fund ranch expenses and related-party transactions (including salaries and transfers to family members) reflects a pattern of self-dealing that continues to taint these cases. *See, e.g.,* Transcript of Hearing Held March 10, 2025, 59:10-12 [Docket No. 188] (Mr. Walker testifying that the Debtors have been paying expenses for both the Llano Ranch and the Oregon Ranch.).

9.      Indeed, such diversion includes a $45,100 salary to Mr. Hoerauf's spouse, Deanna Hoerauf, and a $54,500 salary to his sister-in-law, Terri Vaught, through O'Ryan FLP. Mr. Hoerauf has also made unexplained payments from O'Ryan FLP's account in the amount of at least $54,861.74 over a series of withdrawals titled "RHC Draw American Express," "RHC Draw Citibank," and "RHC Draw Ranches." These withdrawals are in addition to a "RCH Draw

---

[3] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the First Day Declaration.

Lakehouse," and a $56,700 transfer to himself for "distributions." *Statement of Financial Affairs of O'Ryan Family Limited Partnership* [Case No. 25-90003, Docket No. 17]. Mr. Hoerauf, through Ryan C. Hoerauf, Inc. has also paid at least $270,896.06 to insiders, including to himself for lake house expenses and salary, a salary to his brother-in-law Thomas Jaeger, and payments to Ms. Vaught for an unexplained "auto allowance." *Statement of Financial Affairs of Ryan C. Hoerauf, Inc.,* [Case No. 25-90006, Docket No. 18]. Postpetition, Mr. Hoerauf has not appeared at court hearings or 341 meetings, despite signing the Debtors' petitions and the original schedules filed by O'Ryan Ranches, Ltd., the latter of which were subsequently amended and signed by Mr. Walker prior to a continued 341 meeting. *Compare Schedules of O'Ryan Ranches, Ltd.*, [Case No. 25-40434, Docket No. 19] *to Schedules of O'Ryan Ranches, Ltd.*, [Case No. 25-40434, Docket No. 22].

10. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are acting as debtors-in-possession and continue to operate their business and to manage their estates. However, their finances remain hopelessly entangled, with professionals unable to trace intercompany transfers after months of effort. *See id.* at ¶¶ 79–80 (admitting routine intercompany funding "to reimburse certain Debtors for various expenditures").

11. The prepetition accounting was so deficient that the Debtors employed Lain Faulkner to reconstruct their records. *See id.* at ¶ 35. Additionally, at the March 10, 2025 Hearing on Debtor Scanrock Oil and Gas, Inc.'s *Motion to Use Cash Collateral, Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief*, the Debtors' Chief Restructuring Officer acknowledged

5

17195761

the books and records require "some catching up to go." Transcript of Hearing Held March 10, 2025, 29:6-13 [Docket No. 188].

12.     The Debtors produced a 13-week cash flow budget only late on April 22 after numerous requests from the Committee and Prosperity, and have yet to provide a definitive timeline for completing the workover projects or to make any progress on a DIP financing. *See* First Day Declaration, ¶ 35. Moreover, the Committee has requested that the Debtors provide information and documentation reflecting all transfers to insiders and affiliates for the four years prior to the Petition Date, but the Debtors have not been able to provide such information, presumably due to the poorly-kept records. Instead, the Debtors required a formal request for production after several informal requests were ignored. Routine intercompany transfers between entities continue postpetition, *see* First Day Declaration, ¶79-80, and various Debtor entities have scheduled millions of dollars in intercompany transfers, often based on transactions with non-Debtor entities. *See, e.g., Schedule of O'Ryan Family Limited Partnership* [Case No. 25-90003, Docket No. 15] (scheduling nearly $10 million in "Intercompany Receivables").

13.     On March 18, 2025, the U.S. Trustee filed the *Notice of Appointment of the Official Committee of Unsecured Creditors* [Docket No. 143]. The Committee retained Porter Hedges LLP as its counsel and Riveron Consulting LLP as its financial advisor effective as of March 20, 2025, and March 24, 2025, respectively.

14.     On March 28, 2025, the U.S. Trustee filed the Motion seeking appointment of three trustees over the Smackover, FLP, and RCH estates.

17195761

**STATEMENT IN SUPPORT OF THE MOTION**

**A. Mr. Hoerauf should not be in control of the Debtors.**

15. As a threshold matter, the Committee agrees with the U.S. Trustee that appointment of a trustee is necessary under these circumstances. Bankruptcy courts will leave a debtor in possession of its assets and business only when current management "can be depended upon to carry out the fiduciary responsibilities of a trustee." *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985). The Court can appoint a trustee either based on a finding of cause (11 U.S.C. § 1104(a)(1)) or based on it being in the interest of creditors (11 U.S.C. § 1104(a)(2)). Although section 1104(a)(l) expressly identifies four bases upon which "cause" may be found—fraud, dishonesty, incompetence and gross mismanagement—these enumerated grounds are not exhaustive, merely illustrative. *See, e.g., In re Cajun Elec. Power Cooperative, Inc.*, 191 B.R. 659, 661 (M.D. La. 1995) ("It is clear that the grounds for cause are not limited to those enumerated in section 1104(a)(1).").

16. The determination of whether cause exists to appoint a chapter 11 trustee is highly fact-intensive and requires the court to consider "whether the totality of the circumstances warrant appointment of a trustee." *In re Sundale, Ltd.*, 400 B.R. 890, 900 (Bankr. S.D. Fla. 2009) (citing *In re Sharon Steel Corp.*, 871 F.2d 1217, 1228 (3d Cir. 1989)). Even if the Court does not find that "cause" exists to appoint a chapter 11 trustee under section 1104(a)(1), the Court has wide discretion to appoint a trustee under section 1104(a)(2) where, as here, doing so is in the best interests of the parties and the estate. *See also In re Cajun Elec.*, 191 B.R. at 661 ("[u]nder [section 1104(a)(2)], there is a flexible standard for the Court to follow").

17. In exercising its discretion to appoint a trustee under section 1104(a)(2), the Court may consider many factors, including: (i) the trustworthiness of the debtor; (ii) the debtor in

7

17195761

possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence, or lack thereof, of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment. *See, e.g., In re Cajun Elec.*, 191 B.R. at 661-62 (listing factors); *In re Ionosphere Clubs. Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (same).

18. Mr. Hoerauf has demonstrated that he should not remain in control of the Debtors and that cause exists to appoint a trustee. As evidenced by the record, he routinely misused corporate funds prepetition—diverting money from the oil and gas debtors to pay for personal ranch expenses rather than satisfying legitimate obligations to vendors and royalty claimants. *See* Transcript of Hearing Held March 10, 2025, 20:5-13 [Docket No. 188]; *see also Global Notes and Statement of Limitations, Methodology, And Disclaimers Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs*, [Case No. 25-90006, Docket No. 18, p. 26]. This self-dealing has contributed to the Debtors' unsecured debt of $10.5 million and $6 million in unpaid royalties, further underscoring his mismanagement. *See* Docket No. 28, ¶¶ 19-20. Worse still, the Oil and Gas Debtors are not cashflow positive, now several months into this case.

19. Additionally, Mr. Hoerauf engaged in many related-party transactions, including: (1) paying his spouse, Deanna Hoerauf, a $45,100 salary; (2) paying his sister-in-law, Terri Vaught, a $54,500 salary and an unexplained $12,509.78; (3) paying his brother-in-law, Thomas Jaeger, a salary of $123,500 and an unexplained $14,756.03; (4) transferring Ms. Vaught $15,000 for an "auto allowance; and (5) paying himself an $88,000 salary, $44,396.06 for "Lakehouse expenses," another $7,613.63 that he called "RCH Draw Lakehouse," $54,861.74 over a series of withdrawals titled "RHC Draw American Express," RHC Draw Citibank," and "RHC Draw

8

17195761

Ranches," and $56,700 in "Distributions" despite no apparent justification for these expenditures, which total $516,937.24.[4] *See Global Notes and Statement of Limitations, Methodology, And Disclaimers Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs,* [Case No. 25-90003, Docket No. 17, p. 35]. This pattern of misconduct constitutes precisely the type of gross mismanagement that justifies trustee appointment under section 1104(a)(1). The diversion of millions from operating entities to pay ranch costs, personal expenses, and salaries to family members reflects a fundamental breach of fiduciary duty that continues to taint the cases.

20. Mr. Hoerauf's continued control of the Debtors is untenable given his systemic failures of oversight and disregard for creditor interests. The Debtors' prepetition accounting was so deficient that they employed Lain Faulkner to reconstruct their financial records, *see* Docket No. 99, with the Debtors' own representative acknowledging the books and records have "some catching up to go." *See* Transcript of Hearing Held March 10, 2025, 29:6-13 [Docket No. 188]. While Mr. Walker has been involved in the Debtors' operations, his ability to properly stabilize the estates has been fundamentally constrained by Mr. Hoerauf's ongoing influence. Postpetition mismanagement persists, with the Debtors continuing to fund ranch expenses while failing to file bankruptcy petitions for the entities owning the Oregon ranch and only belatedly listing a portion of the Llano ranch for sale. Most tellingly, Mr. Hoerauf has abdicated his fiduciary duties entirely—failing to attend court hearings or 341 meetings, much less provide testimony about these troubling patterns. This conduct demonstrates that any effective restructuring must begin with Mr.

---

[4] The listed transfers are only those of which the insider nature of the payment is obvious on its face. However, FLP's and Ryan C. Hoerauf, Inc.'s respective Statements of Financial Affairs reflect several other unexplained expenses. Indeed, FLP paid $38,513.89 to Amex Epayment; $40,222.40 to Bank of America; $103,086.84 to Chase Credit Card; and $83,311.20 to Citi Payment. None of these transactions were listed as insider payments explicitly, but they have no description and the purpose for the expenses remains unknown. Similarly, Ryan C. Hoerauf, Inc. made an unexplained payment of $72,454,11 to Chase Credit Card.

9

17195761

Hoerauf's complete removal from decision-making authority. *See In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 ("continuing mismanagement of the affairs of a debtor after the filing date is evidence of the need for the appointment of a trustee.")

21.    Mr. Hoerauf's conduct satisfies multiple "cause" factors, from fraud (self-dealing transfers) to incompetence (failure to maintain basic accounting records). Even if the Court were to find no single violation rises to the level of "cause," the totality of circumstances—including creditors' justifiable lack of confidence in management—makes appointment plainly in creditors' best interests under section 1104(a)(2).

22.    Indeed, the discretionary factors governing trustee appointment under section 1104(a)(2) support the removal of current management in these cases. First, the Debtors' demonstrated lack of trustworthiness is manifest in Mr. Hoerauf's pattern of financial improprieties, including the improper diversion of corporate assets for personal benefit and related-party transactions that have demonstrably harmed creditor interests. Second, the Debtors' abysmal operational performance—evidenced by their failure to produce essential financial reporting, develop a viable reorganization strategy, or properly market estate assets—demonstrates both historical mismanagement and dim prospects for rehabilitation under current leadership. Third, the near-universal lack of creditor confidence in existing management is reflected not only in the Committee's Statement, but in the professional fees expended to reconstruct basic financial records that management failed to maintain, as well as in the contentious relationship that Mr. Hoerauf has with Prosperity Bank [Docket No. 264].

23.    Importantly, the benefits of appointing an independent trustee—including the ability to (a) investigate and pursue valuable estate claims, (b) implement transparent asset sales free from insider influence, and (c) restore creditor trust in the chapter 11 process—far outweigh

17195761

the modest administrative costs of such appointment. Where, as here, every discretionary consideration weighs decisively in favor of trustee appointment, appointment of a trustee is an appropriate measure to ensure proper administration.

**B. Mr. Walker has shown a lack of independence under the influence of Mr. Hoerauf.**

24. While Mr. Walker has taken steps to stabilize operations—including marketing the Oregon Ranch—his independence remains questionable. Most concerningly, he unilaterally increased Mr. Hoerauf's salary to offset the cessation of personal expense payments, despite Mr. Hoerauf never requesting such adjustments. *See* Transcript of Hearing Held March 31, 2025, 124:2-126:8. This decision, coupled with an inability to fix the Debtors' liquidity issues, suggests Walker has been unable to fully disentangle the estates from Mr. Hoerauf's influence. For example, the Debtors have yet to provide a 13-week cash flow budget (essential for evaluating oil and gas viability), offered no clear timeline for completing the workover project, and failed to fix the oil and gas operations.

25. Particularly troubling is Mr. Walker's reluctance to list the entire Llano ranch for sale, another indication of Mr. Walker's constrained independence. A chapter 11 trustee would presumably move immediately to market all available assets for the benefit of creditors. Moreover, a chapter 11 trustee would facilitate the production of pertinent information to the Committee— namely, information and documentation reflecting all transfers to insiders and affiliates for the four years prior to the Petition Date. A chapter 11 trustee would also be more apt to improve the efficiency of the Debtors' operations. Specifically, the Debtors have been unable to complete the workover project for months, and they have failed to offer a clear timeline for completion. Such delay begets further delay in the administration of the estates, as the success of the well will significantly impact reserve analysis and case valuation.

17195761

26. Furthermore, the Debtors continue to show inaction related to numerous potentially valuable causes of action against Hoerauf and the non-Debtor affiliates, such as preference, fraudulent transfer, breach of fiduciary duty, and other insider claims. Because of Mr. Hoerauf's continued control of the Debtors and Mr. Walker's resulting lack of independence, the Debtors are not investigating or pursuing those claims. A chapter 11 trustee would be in complete control and completely independent, and, consequently, would be inclined to investigate and pursue such claims for the benefit of all creditors.

27. The path forward is clear: substantive consolidation, a liquidating trust to monetize assets efficiently, and 100% creditor recoveries, either through asset sales or litigation against Mr. Hoerauf. Yet progress has stalled under the current structure. A chapter 11 trustee would bring both independence and urgency to this process, eliminating the distractions of insider entanglements and forcing long-overdue transparency. While the Committee recognizes certain operational efforts, the estates require decisive leadership—one that prioritizes creditor recoveries.

**C. The Committee objects to the appointment of three chapter 11 trustees because only one chapter 11 trustee is necessary.**

28. The Committee opposes the U.S. Trustee's motion to appoint three Chapter 11 trustees as unnecessary and unduly burdensome. First, any potential conflicts among the Debtors can be adequately addressed through substantive consolidation, which would streamline administration without the need for multiple trustees. Second, as the U.S. Trustee noted in the Motion, the Debtors' estates are already cash-constrained, and the appointment of three separate trustees—each with their own counsel and potential financial advisors—would impose excessive costs, depleting value that should instead be preserved for creditors. Finally, a single trustee who oversees the consolidated estates would have full authority and standing to investigate and pursue any and all causes of action on behalf of all creditors. Such efforts would not require more than

one chapter 11 trustee supported and assisted by the Committee. A single trustee is both sufficient and more efficient under these circumstances.

## REQUEST FOR SUBSTANTIVE CONSOLIDATION

29. Substantive consolidation is the most cost-effective and efficient remedy for administration of the Debtors' estates. The Northern District of Texas recognizes that case law has developed two standards in determining whether substantive consolidation is appropriate: (1) a "more traditional" multi-factor test (with factors similar to those of piercing the corporate veil and which ultimately gets condensed to two critical factors) and (2) a balancing of harm test. *In re AHF Development, Ltd.*, 462 B.R. 186, 194–97 (Bankr. N.D. Tex. 2011); *In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 93 (Bankr. N.D. Tex. 2017).

30. Under the traditional multi-factor tests, courts look to a variety of factors in determining whether substantive consolidation is appropriate, including:

1) The presence or absence of consolidated financial statements;
2) The unity of interests and ownership between the various corporate entities;
3) The existence of parent and intercorporate guaranties on loans;
4) The degree of difficulty in segregating and ascertaining individual assets and liabilities;
5) The transfer of assets without formal observance of corporate formalities;
6) The commingling of assets and business functions;
7) The profitability of consolidation at a single physical location;
8) The parent corporation owns all or a majority of the capital stock of the subsidiary;
9) The parent and subsidiary have common officers and directors;
10) The parent finances the subsidiary;
11) The parent is responsible for incorporation of the subsidiary;
12) The subsidiary has grossly inadequate capital;
13) The parent pays salaries, expenses, or losses of the subsidiary;
14) The subsidiary has substantially no business except with the parent;
15) The subsidiary has essentially no assets except for those conveyed by the parent;
16) The parent refers to the subsidiary as a department or division of the parent;
17) The directors or officers of the subsidiary do not act in interests of the subsidiary, but take directions from the parent;
18) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed;

17195761

*In re ADPT DFW Holdings, LLC*, 574 at 93–94; *In re AHF Development*, 462 B.R. at 195–96. No single factor or group of factors is determinative in a court's inquiry, *id.* at 96, and courts have often distilled these factors into two critical factors: (1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (2) whether the affairs of the debtors are so entangled that consolidation would benefit all creditors. *In re ADPT DFW Holdings, LLC*, 574 at 95–96 (citing *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515 (2d Cir. 1988); *In re Ward*, 558 B.R. 771, 794 (Bankr. N.D. Tex. 2016) (citing *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515 (2d Cir. 1988)). The Northern District of Texas held that the presence of either factor is sufficient to order substantive consolidation. *In re ADPT DFW Holdings, LLC,* 574 B.W. at 96.

31. Here, the factors weigh in favor of substantive consolidation of the Debtors' estates. The Debtors' operations and finances are so hopelessly entangled that substantive consolidation is not only appropriate but necessary to maximize creditor recoveries. As demonstrated by the inability of Lain Faulkner (the Debtors' financial advisor) and Mr. Walker to provide meaningful clarity on intercompany transfers, the Debtors and their non-filing affiliates operated without regard for corporate formalities—particularly through Mr. Hoerauf's systematic diversion of oil and gas assets to fund his ranches and personal lifestyle. These facts satisfy nearly every traditional factor for consolidation, including: (1) commingled assets and business functions (e.g., funds shifted across entities for improper purposes); (2) disregard for corporate formalities (e.g., Hoerauf's self-dealing); (3) unity of interests and ownership (Hoerauf controlled all entities); and (4) the near-impossibility of segregating liabilities (evidenced by the professionals' inability to trace transfers). *See In re ADPT DFW Holdings, LLC*, at 93–94.

14

32. The Debtors' conduct also satisfies the Balancing of Harm Test, which requires (1) substantial identity between the entities, and (2) that consolidation is necessary to avoid harm or realize benefits. *In re ADPT DFW Holdings, LLC*, 574 B.R. at 100–01. Here, the substantial identity between the Debtors and non-Debtor affiliates is undeniable: Mr. Hoerauf treated all entities as interchangeable funding vehicles, diverting oil and gas proceeds to ranches and personal expenses without regard for corporate formalities. This created a de facto single enterprise—one where financial records are so commingled that even the Debtors' professionals cannot trace intercompany transfers. Such blatant disregard for separateness triggers the presumption that creditors did not rely on the credit of any single entity. *Id*. at 101.

33. Critically, consolidation is necessary here to avoid two irreparable harms: (1) the administrative nightmare and cost of untangling years of commingled assets, and (2) the inequity of leaving unsecured creditors of looted entities with empty hands while others recover from asset-rich entities. No creditor has shown—or could show—prejudicial reliance on the separateness of any one entity, as all credit was extended based on the perceived unity of Mr. Hoerauf's empire. Even if a creditor could make such a showing, the overwhelming benefits of consolidation—preserving estate value, ensuring equitable distribution, and rectifying Mr. Hoerauf's malfeasance—would far outweigh any speculative harm. See *id*. (requiring only that benefits "heavily outweigh" harm).

34. Consolidation is also equitable. Secured creditors, who are oversecured, face no prejudice, while unsecured creditors of looted entities—who might otherwise recover nothing due to Hoerauf's malfeasance—would share in the pooled assets. *See In re No Rust Rebar, Inc*., 2023 WL 4497328, at *11 (Bankr. S.D. Fla. July 12, 2023) (approving consolidation by motion given

15

17195761

entangled affairs). The cost savings alone justify consolidation as they benefit every creditor. The Court should grant substantive consolidation to ensure a fair, efficient, cost-effective resolution.

## **RESERVATION OF RIGHTS**

35.     The Committee is continuing to investigate matters related to the Debtors and to the facts underlying the Debtors' business operations. Accordingly, the Committee reserves all rights to supplement or amend this statement prior to the Hearing, including with any information discovered at the deposition of Mr. Hoerauf, scheduled for April 25, 2025.

## **CONCLUSION**

WHEREFORE, PREMISES CONSIDERED, the Committee respectfully requests that this court enter an order: (i) appointing one chapter 11 trustee to oversee the consolidated estates; and (ii) further relief to which it may be entitled, at law or equity.

16

17195761

Respectfully submitted this 24th day of April, 2025.

**PORTER HEDGES LLP**

*/s/ Eric M. English*
Eric M. English
Texas Bar No. 24062714
M. Shane Johnson
Texas Bar No.  24083263
Jack M. Eiband (*pro hac vice* forthcoming)
Texas Bar No. 24135185
Adriana T. Young
Texas Bar No. 24138188
**PORTER HEDGES LLP**
1000 Main St., 36th Floor
Houston, TX 77002
Tel: (713) 226-6000
Fax: (713) 226-6248
eenglish@porterhedges.com
sjohnson@porterhedges.com
jeiband@porterhedges.com
ayoung@porterhedges.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

17195761

## CERTIFICATE OF SERVICE

      I hereby certify that on April 24, 2025, a true and correct copy of the foregoing document was served via email through the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

                                      */s/ Eric M. English*
                                      Eric M. English

17195761